No. 47,991

HARRY LIGHTCAP and LELA LIGHTCAP, W. I. CUTTER, FERN ELLEN MAUPIN, RICHARD M. STEWART, HAROLD PARKER and FANNIE M. FLOWER, *Appellees,* v. MOBIL OIL CORPORATION, formerly known as SOCONY MOBIL OIL CORPORATION, INC., *Appellant.*

(562 P. 2d 1)

Opinion filed March 5, 1977.

*Mark H. Adams* and *Richard Jones,* of Wichita, argued the cause, and *John E. Robertson,* of Denver, Colorado, and *Jack D. Sage,* of Wichita, were with them on the briefs for the appellant.

*Gerrit H. Wormhoudt,* of Wichita, argued the cause, and *Dale M. Stucky* and *John T. Conlee,* of Wichita, were with him on the brief for the appellees.

The following opinion was prepared by Foth, C., prior to his becoming a member of the Court of Appeals, and is now ordered filed as the opinion of the court:

In these six cases, consolidated for trial, the plaintiff-appellees are royalty owners and lessors under various natural gas leases in the Hugoton field now held by the defendant-appellant, Mobil Oil Corporation, as lessee. We are told that there are nearly three hundred similar cases pending in the district court whose outcome will be largely determined by the decision here.

Plaintiffs sought and received judgments for additional royalties on gas produced by defendant and its predecessor from late 1958 through June 30, 1963. The increase was based on the difference

between the claimed higher "market value" of the gas produced by Mobil, and the amounts actually received by it from its sales to its pipeline customer on which it paid royalties. Mobil counterclaimed (by way of setoff) for alleged overpayments of royalties for the period January 1, 1954, through January 31, 1958; its counterclaim was denied. Mobil has appealed from the judgments for additional royalties and the denial of its counterclaim. In addition, the trial court allowed prejudgment interest on part of plaintiffs' claims but denied it as to the balance. Mobil appeals from the allowance of interest, and plaintiffs have cross-appealed from the partial denial.

## I. *Background; The Primary Issue*

This case is closely parallel to *Waechter v. Amoco Production Co.*, 217 Kan. 489, 537 P. 2d 228 (June 14, 1975), adhered to after rehearing, 219 Kan. 41, 546 P. 2d 1320 (March 6, 1976). In each case the basic claim of the plaintiff royalty owners was that under their leases they were entitled to have their royalties computed on the "market value" at the wellhead of the gas taken by the producer. That "market value," they asserted, was to be determined by the traditional "free market, willing buyer-willing seller" test, without regard to any governmental regulation of the producer's sales price.

The producers, on the other hand (Amoco there, Mobil here) relied on the fact that their sales at the wellhead were for resale in interstate commerce, and their sales prices were thus subject to Federal Power Commission regulation under the Natural Gas Act of 1938, 15 U. S. C. § 717 *et seq.* (That principle was established June 7, 1954, by *Phillips Petroleum Co. v. Wisconsin*, 347 U. S. 672, 98 L. Ed. 1035, 74 S. Ct. 794.) The result, they claimed, was that the "market value" of the gas they sold was the ceiling price fixed by the FPC.

The determination of the primary issue in both cases was delayed for several years by a federal injunction staying the state cases while the producers, along with other producers, conducted the litigation resulting in *Mobil Oil Corporation v. Federal Power Commission*, 463 F. 2d 256 (D. C. Cir. 1972), cert. den. 406 U. S. 976, 32 L. Ed. 2d 676, 92 S. Ct. 2409. That case held that a royalty owner is not a "natural gas company" as defined in the Natural Gas Act because he does not engage in the "sale" of gas in interstate commerce. Hence the FPC has no jurisdiction over a royalty owner or over a dispute between a royalty owner and his producer as to the amount of royalties payable under a gas lease.

Once *Mobil* had been decided and review by the United States Supreme Court had been denied, the state litigation was allowed to proceed. The district courts in both *Waechter* and this case concluded that the plaintiff royalty owners were entitled to be paid on the basis of an unregulated "market value."

The producers in each case had committed their entire production to the interstate market under long term contracts. In *Waechter* the 1950 contract between the producer Amoco (then called Pan American Petroleum Corp.) and the purchaser Cities Service called for a fixed price until June 23, 1961, and thereafter for a "fair and reasonable" price for each successive five year period, based on the going price in the field. When the parties were unable to agree the price was settled by a declaratory judgment action, affirmed in *Pan American Petroleum Corporation v. Cities Service Gas Co.*, 191 Kan. 511, 382 P. 2d 645. The amount fixed in that case was employed by the district court in *Waechter* as the "market value" of the gas. In this case there were two contracts between the predecessor of the producer Mobil and its pipeline purchaser, Northern Natural Gas Company, called the "A" and "B" contracts. Both called for fixed prices until July 1, 1958, and for each five year period thereafter the "fair, just and reasonable" price for gas produced in the field. These contracts called for arbitration in the event of disagreement, and as a result arbitrators fixed a "fair, just and reasonable" price for the gas sold under the contracts for the five year period here in issue. Neither the royalty owners nor Mobil offered any independent evidence on the issue of market value, as they might have. (See *Lippert v. Angle*, 211 Kan. 695, 508 P. 2d 920.) As a result the district court in this case employed the arbitrated prices as the "market value" under the leases in the same way the judicially fixed price was employed in *Waechter*.

In both cases the producers submitted the proposed new rates (the one determined by suit, the other by arbitration) to the FPC for approval. Neither rate was approved as filed, but both were ultimately adjusted downward. In both cases the royalty owners sought the difference between the royalties paid on the rates ultimately approved, received and lawfully retained by the producers from their purchasers, and the royalties they would have received if the FPC had approved the new rates based on the "market value" of the gas.

In both cases the district courts construed the royalty clauses in the leases to require royalties based on an unregulated market value,

found no constitutional impediment to requiring payment on that basis, and rendered judgment for the plaintiff royalty owners accordingly.

In *Waechter* we reversed on this issue, based on a contrary construction of the prototype royalty clause by which all members of the plaintiff class had agreed to be bound. We found that it called for royalties based on the "proceeds" received by the producer, and not on the "market value" of the gas. We observed that "Proceeds ordinarily refer to the money obtained by an actual sale." (217 Kan. at 512.) Since royalties had been paid on the "proceeds" of all of Amoco's sales to Cities, the royalty owners were not entitled to any additional royalties.

Under that reasoning the court was not called upon in *Waechter* to construe the term "market value," or to determine how it might be affected by FPC regulation. In this case, however, we are confronted with several different forms of lease, some of which indisputably call for royalties based on "market price" or "market value." (The majority, and the trial court, make no distinction between those terms but use them interchangeably. Both are construed to mean what the product will bring in the marketplace, without regard to any element of "inherent" value.) It is therefore necessary in this case to determine whether "market value" (or "market price") means value in a hypothetical free market, or value in the interstate market as limited by FPC regulation.

## II. *Jurisdiction and FPC Regulation*

Before doing so, however, it is appropriate to examine the jurisdiction of the courts to order royalties to be paid on any other basis than the FPC approved sales price to the producer. Obviously if such jurisdiction is lacking, no further inquiry into the terms of the leases is required. We are cited to no case where this question has been squarely determined, but we think the fair implication from the federal decisions in the area is that such jurisdiction does exist.

We begin with the companion cases of *Weymouth v. Colorado Interstate Gas Company*, 367 F. 2d 84 (5th Cir. 1966), and *J. M. Huber Corporation v. Denman*, 367 F. 2d 104 (5th Cir. 1966). In each the court looked at gas leases with royalty clauses requiring payments based on "market value," and carefully distinguished them from "proceeds" leases. The result, it concluded, was that the "market value" of the gas for royalty payments was not necessarily the same as the actual proceeds from the sale of the gas under the

FPC ceiling. The lessee-producer in *Huber* argued, however, that by committing the gas to the interstate market and thus subjecting its price to FPC regulation the parties had determined the "market" in which "market value" was to be determined. The court responded to this argument:

"We do not minimize the beguiling appeal of the Lessee-Producer's theory. Without a doubt, with the Lessors' full approval, this committed until the exhaustion of the reserves all of the gas to this contract and hence to this 'market.' But the 'market' as the descriptive of the buyer or the outlet for the sale is not synonymous with its larger meaning in fixing price or value. For in that situation the law looks not to the particular transaction but the theoretical one between the supposed free seller *vis-a-vis* the contemporary free buyer dealing freely at arm's length supposedly in relation to property which neither will ever own, buy or sell. It was not, as this theory would make it read, an agreement to pay 1/4th of the price received from the market on which this gas is sold. Rather, it was to pay 1/4th of the 'market price' or 'market value' as the case might be." (367 F. 2d at 109-10.)

*Huber* thus stands for the proposition that a "market value" lease *on its face* calls for payment at the theoretical free market value. Having decided that much, however, the court encountered the fact that if the market value of the gas were proven to be the amount claimed by the lessors there would be a substantial impact on the lessee's regulated operation. It went on to say, "there is a serious question whether a Court, state or federal, either initially or ultimately, may allow any amounts fixed by jury, court, or both as increased royalty payments without express prior approval of the Federal Power Commission if, as would these, the price thus fixed would exceed levels prescribed by the FPC." (*Id.* at 110-11.) The court therefore directed that trial proceedings to determine the free market price of the gas be held in abeyance until a ruling could be obtained from the FPC on whether that agency had jurisdiction over royalty rates.

The result was *Mobil Oil Corporation v. Federal Power Commission,* supra, in which the District of Columbia Circuit reversed the FPC's assertion of jurisdiction over royalty rates. Various producers there argued for FPC jurisdiction on the basis of the potential impact on interstate commerce and the burden on consumers which might result from royalties based on "market values" in excess of the producers' rates fixed by the FPC. On the first issue it found the record insufficient to stretch the act beyond its terms "on the score of necessity." As to the second ground it observed:

". . . [T]he FPC's opinion gives no concrete indication of whether, in what circumstances, or to what extent, there may be an economically mean-

ingful problem of 'market prices' in excess of ceilings. In the *Huber* case the judgment entitling the royalty owners to pursue their claim made no determination of amounts of recovery. Apparently such litigation may come to involve substantial sums even if pursued so as to recover royalties based on ceilings higher than filed rates. This we infer from the fact that Mobil Oil and other producers have appealed from the ruling of the FPC that although the royalty owners' filing obligations are met by virtue of the filings made by the producers, a royalty owner is not limited to the rate filed by the producer and may enforce his contract as calling for a higher rate if permitted by the Act. The record simply does not focus on what may be involved in the possibility of recovery of royalty calculated on the basis of 'market prices' higher than ceilings." (*Id.* at 264.)

The court then went on to observe:

". . . To avoid any misunderstanding we interject that we have not been made uneasy by the contentions the producers have presented to us, for *we see no theoretical impediment to producers' being held on the basis of a contract to a royalty payment related to a base higher than the producers' filed rate.* United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U. S. 332, 76 S. Ct. 373, 100 L. Ed. 373 (1956)." (*Id.* at 264-5. Emphasis added.)

The end result was that *Mobil* left it open to the courts, either state or federal, to determine lease controversies between royalty owners or lessees. It noted, but only and expressly by way of dictum: "We can certainly visualize the possibility that a court confronted with a contention of entitlement to a market price basis higher than the producer's ceiling would consider it to run counter to the intention of the parties, unless there is something to rebut the fair presumption that they contemplated interstate movement and market prices compatible therewith." (*Id.* at 265.) It also suggested public policy considerations, and problems under the supremacy clause, both of which might be obviated by a reference to the FPC. All such factors have been considered by the court in *its* decision here.

In a southern Louisiana area rate case the Fifth Circuit affirmed rates fixed by the FPC despite claims by Mobil that they failed to take into account the possibility that under the *Mobil* decision royalty obligations might be based on a rate higher than the FPC ceiling. (*Placid Oil Company v. Federal Power Commission*, 483 F. 2d 880 [5th Cir. 1973].) The court held that this possibility was no basis for disturbing the FPC rate, saying:

"Of course the royalty obligations of the producers are cost components of the rate structure. Any alteration of this component would necessarily alter the departure point of the rate calculations. And under the holding of the D. C. Circuit in *Mobil,* this would be an *Erie* determination of the contract stating the royalty percentage based upon the applicable principles of state law—

totally beyond the control of the federal regulatory agency charged with the responsibility of regulating natural gas rates.

"But we are not willing to alter or stay the implementation of area wide rates for the entire industry merely on the basis of what *might* happen to *some* producers' costs *if* this statement of the law prevails.

"If, as subsequent events develop, the producers are put in a bind by their royalty obligations, they may certainly petition FPC for individualized relief." (483 F. 2d at 911.)

The closest the United States Supreme Court has come to ruling on the question was in affirming the *Placid* decision, *sub nom., Mobil Oil Corp. v. FPC*, 417 U. S. 283, 41 L. Ed. 2d 72, 94 S. Ct. 2328 (1974). Of the same contention by Mobil which had been rejected below, the court said:

"Mobil also complains that the Commission failed to provide automatic adjustments in area rates to compensate for anticipated higher royalty costs. It relies on *Mobil Oil Corp. v. FPC*, 149 U. S. App. D. C. 310, 463 F. 2d 256 (1972), where the Court of Appeals for the District of Columbia Circuit reversed a Commission holding that subjected royalties to FPC administrative ceilings. Mobil argues that under that decision the 1971 rate schedules must take into account the possibility of higher royalty obligations. We agree with the Court of Appeals that Mobil's argument is hypothetical at this stage and that *in any event an affected producer is entitled to seek individualized relief.*" (417 U. S. at 328. Emphasis added.)

The Court then quoted with approval the last two paragraphs of the Fifth Circuit opinion quoted above. Thus the possibility that a royalty base might exceed the FPC ceiling was clearly recognized. And cf., *FPC Texaco Inc.*, 417 U. S. 380, 395, 397-8, 41 L. Ed. 2d 141, 94 S. Ct. 2315, where the court emphasizes that the "market value" of gas and "just and reasonable" rates for gas utility regulation are two separate and distinct things. (Approaching the problem from the other end, the court in that case held that the FPC would be abdicating its statutory rate setting function if it permitted the market value of gas sold to fix the rates to be charged by any producers under its jurisdiction.)

We think this concept furnishes the answer to Mobil's argument that the public interest and the supremacy clause require that the FPC ceiling be accepted as fixing the "market value" of the gas for royalty purposes. The FPC fixes the rates which the producer (Mobil) may charge its pipeline purchaser (Northern) as a matter of utility rate setting. That is, it fixes a rate basically designed to allow the producer its reasonable costs of production plus a reasonable return on its investment. (See, e. g., *Placid Oil Company v. Federal Power Commission*, supra; *Forest Oil Corporation v.*

*F. P. C.*, 263 F. 2d 622 [5th Cir. 1959]; *City of Detroit, Michigan v. Federal Power Com'n*, 230 F. 2d 810 [D. C. Cir. 1955].)

One of the complaints against area rate setting was that it failed to account for variances in the costs of individual producers. This argument was first rejected in the *Permian Basin Area Rate Cases*, 390 U. S. 747, 20 L. Ed. 2d 312, 88 S. Ct. 1344 (1968). One basis for the rejection, as recognized by the Supreme Court in the southern Louisiana area rate cases (*Mobil Oil Corp. v. FPC*, supra) was the availability of individualized relief to a producer whose costs, including royalties, were unusually high. A producer required to pay royalties in excess of those contemplated by the FPC in establishing its original rates may seek rate relief from the FPC.

The fact that such relief cannot be retroactive is immaterial. An argument based on similar grounds was made in *FPC v. Texaco Inc.*, supra, where the court was considering an FPC order which had the effect of removing the rates charged by small producers from direct FPC regulation. Large producers and pipelines, who bought from the small producers, were to make their own bargains and thus to pay market value. The costs thereby incurred could be initially passed on to the consumer, subject to refund if it were later determined that such costs were excessive. Although the FPC order was found deficient, it was not because of the economic hazards it imposed on the regulated companies. The Court said:

"This leads to the contention of the pipelines and the large producers that the scheme of indirect regulation envisioned by Order No. 428 unfairly subjects them to the risk of later determination that their gas costs are unjust and unreasonable and to the obligation to make refunds which they cannot in turn recover from the small producers whose rates have been found too high. But those whose rates are regulated characteristically bear the burden and the risk of justifying their rates and their costs. Rate regulation unavoidably limits profits as well as income. . . . All that is protected against, in a constitutional sense, is that the rates fixed by the Commission be higher than a confiscatory level." (417 U. S. at 391-2.)

It boils down to this: Mobil contends that the rate it is permitted to charge puts a ceiling on the royalty costs it may incur. As the court reads the cases cited above, the process begins at the other end. The royalties to be paid are first to be determined under state law, based on the terms of the lease. The royalties so determined then become a component cost, to be considered by the FPC in determining the rates it will permit Mobil to charge. In this respect royalties paid are costs to a gas producer in the same way as fuel bills are costs to an electric utility. Neither cost is directly under

the jurisdiction of the utility's regulatory agency, but both are considered in the agency's rate making function.

On this issue Mobil also points to a clause appearing in most if not all of the leases involved here:

"All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation."

It argues that this language subjects all terms of the leases to federal regulation, and thereby subjects the royalty clause to FPC rate setting. The argument reads too much into a fairly standard lease clause. If FPC rate setting were applicable to royalties, then of course the royalty clause in the lease would perforce yield to the federal regulation. The clause relied on makes that clear. But, as the D. C. Circuit opinion in *Mobil* says, FPC regulation does *not* reach the royalties to be paid under a lease. Hence compliance with the royalty clause is not prevented by any federal regulation, and the clause relied on so heavily by Mobil never comes into play. The clause subordinates the lease only to *applicable* rules and regulations, and FPC rules and regulations are not applicable.

We hold, therefore, that the existence of federal regulation over the rates which a gas producer may receive is no obstacle to the fixing of a higher rate as the "market value" of the gas it sells for the purpose of computing royalties.

### III. *The Leases*

We turn, then, to a consideration of what royalties are called for by the leases under litigation. There are two commonly recognized types of leases employed in the gas industry, "proceeds" leases and "market value" leases. See generally, *Matzen v. Hugoton Production Co.*, 182 Kan. 456, 463-4, 321 P. 2d 576, 73 A. L. R. 2d 1045; *J. M. Huber Corporation v. Denman*, supra. In *Waechter* the primary issue determined by this court was which category covered the royalty clause of the lease there:

"Lessee shall pay lessor monthly as royalty on gas marketed from each well one-eighth (⅛) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then one-eighth (⅛) of the market value thereof at the well." (217 Kan. at 522.)

The clause mentions, it will be seen, both "proceeds" and "market value." The majority in *Waechter* concluded that since all sales by

the producer were made at the wellhead (as they are in this case) the "proceeds" part of the clause was applicable.

The dissenters there pointed to the fact that there were actually a variety of leases involved in addition to the prototype, and that many of these other leases made reference in their royalty clauses to "the prevailing market rate" or to "the market value at the well." They applied the well recognized doctrine that ambiguous instruments are to be construed strictly against their draftsmen. *Smith v. Russ*, 184 Kan. 773, 779, 339 P. 2d 286; *First National Bank of Lawrence v. Methodist Home for the Aged*, 181 Kan. 100, 309 P. 2d 389; *Green v. Royal Neighbors of America*, 146 Kan. 571, 73 P. 2d 1. In the case of an oil or gas lease, this normally means a strict construction against the lessee-producer and in favor of the lessor-royalty owner. *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P. 2d 602. Taking a broad look at the entire clause in context with the clauses in other leases, and construing it strictly against the lessee-producer, the dissenters in *Waechter* concluded:

". . . The entire provision discloses an intention by the parties to the lease that one-eighth of the 'proceeds' from the sale of gas at the well are to be measured by the market value of the gas produced." (217 Kan. at 523.)

There are in the six cases at bar leases which may be said to fall into not just two but three categories. Some seem clearly to call for royalties based on the "proceeds" of a sale, some clearly for royalties on the "market value" of the gas sold, and some which follow the *Waechter* pattern and which, for want of a better term, we shall refer to as "Waechter" leases.

Production from each had been committed by Mobil's predecessor to one of the two separate contracts with Northern (the "A" and "B" contracts). These called for different prices, presumably because of different qualities of the gas. The price differential was maintained by the arbitrators when they fixed the "fair, just and reasonable" price for the five-year period in litigation.

The trial court examined all three types of royalty clause (although, without the benefit of *Waechter* it recognized only two) and concluded:

"The leases herein provide for both a 'market' price or value and 'proceeds' basis for the one-eighth value to be paid gas royalty. Thus the question is presented as to the difference, if any, that should be drawn from these royalty provisions. The defendant strongly urges that 'proceeds' means precisely that and that for the periods in question it translates to FPC approved prices which have been paid. The history of the leases show that in both the 'A' and 'B' contracts the defendant and its predecessors have paid the same prices to

lessors under each contract without distinction as to proceeds or market value leases. The minimum price and ceiling prices are asserted as the reason for this. However, prior to the existence of either regulated price base no distinction was made in royalty payments. This court finds that *the relationship of the lessee with its duty to market at the best market price for its lessor, based on implied covenants in the lease, result in the same obligations on the lessee under both the market value and proceeds basis.* Thus the intentions of the parties has been recognized by the history of identical payments by the lessee and its predecessors and the distinction now sought is an afterthought based on subsequent regulation that neither lessors nor lessees anticipated when the leases were executed.

"The court therefore concludes that 'proceeds' 'market value' 'market price' and 'gross proceeds at the prevailing market rate' *all impose the same burden on lessee to market and pay royalty on the same bases, i. e., the best market value obtainable. The court further finds that the lessee has in good faith negotiated for the best prices available during all periods of time to date.*

"4. *The court finds that the intentions of the parties hereto were to pay lessors on the basis of the prevailing market rates as reflected by the gas purchase contracts negotiated by defendants predecessors with Northern.* The contract resulted in arbitration with prices set at 16.75 cents per mcf for the 'A' contract and 15 cents per mcf for the 'B' contract, both at a pressure base of 14.65 p s i a. Plaintiffs are therefore entitled to judgment for royalty prices based on these applicable rates for a period beginning five years prior to the filing of their respective cases to date hereof." (Emphasis added.)

On the correctness of this holding the members of the court take four separate positions:

Position 1. Two members agree with the trial court's finding that the lessee's duty is the same under a "proceeds" lease and a "market value" lease, and that is to secure the best price obtainable in a free market. They make no distinction, therefore, between any of the three varieties, and regard the lessee's obligation to pay royalties as being measured by "market value." They rely on the fact that the leases were made long before federal regulation came into play, and are convinced by the Fifth Circuit's arguments in *Huber,* quoted above, and the dissent in *Waechter,* that "market value" means value in the free market (here the arbitrated price). They agree with the trial court that the royalty owners are entitled to be paid on that basis under all leases, and would affirm across the board. (The other five members believe there is a distinction between "proceeds" and "market value" leases, but they differ as to the treatment of the two categories.)

Position 2. One member of the court agrees with the previous two insofar as true "market value" leases are concerned. He, however, believes *Waechter* was correctly decided both as to categorizing the lease there as a "proceeds" lease and as to basing the

royalties under a proceeds lease on actual moneys received by the producer.

Position 3. One member of the court also agrees that a "market value" lease calls for royalties on a free market (the price arbitrated). He also believes that *Waechter* dictates the proper disposition of a true "proceeds" lease, but for the reasons set out in the dissent (relating to the ambiguity of the royalty clause) he believes a *Waechter* lease is a "market value" lease.

Position 4. Three members are of the opinion that *Waechter* correctly covers the lease in question there, and all other "proceeds" leases as well. They, however, believe that the "market value" of the gas means the greatest amount obtainable in the market as it actually exists, *i. e.*, for an interstate sale, in the regulated market.

With that division in mind we can proceed to categorize the royalty provisions involved in these six cases and dispose of the trial court's ruling on each. We refer to each case by the plaintiff's name, and emphasize the controlling portion of each royalty clause:

(a) Lightcap case:

"The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, *one-eighth (⅛) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (⅛) of its market value at the well.*"

This is a "*Waechter*" lease. The three justices taking Position 4 are joined by the justice taking Position 2 in holding that this lease is a "proceeds" lease. Royalties are to be calculated on the actual proceeds received, as held in the *Waechter* decision, and the trial court erred in holding otherwise.

(b) Cutter case:

"The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, *one-eighth (⅛) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (⅛) of its market value at the well. . . .*"

This is also a "*Waechter*" lease and is governed by (a) above.

(c) Maupin case:

"To pay the lessor one-eighth, *at the market price at the well* for the gas so used, for the gas from each well where gas only is found, while the same is being used off the premises. . . ."

This is a "market value" lease. Those four members of the court adopting Positions 1, 2 and 3, above, agree with the trial court that royalties on this lease should be paid on the arbitrated market value of the gas.

(d) Stewart case:

"The lessee shall pay lessor, as royalty, one-eighth of *the proceeds from the sale of the gas as such,* for gas from wells where gas only is found, and where not sold shall pay fifty ($50.00) Dollars per annum as royalty from each such well, and while such royalty is so paid such well shall be held to be a producing well under paragraph numbered two hereof. . . ."

This is a "proceeds" lease. The five members of the court adopting Positions 2, 3 and 4 agree that royalties under this lease are to be paid on amounts actually received and lawfully retained by the producer. The judgment below is reversed as to this lease.

(e) Parker case:

The royalty clause in the original lease in this case was replaced by a clause making royalties dependent on production from a quarter section known as the "Parent Tract":

"Lessee shall pay Lessor for gas from each well where gas only is found (a) that is located on Parent Tract, the equal fifteen one-hundredth of one-eighth ($15/100$ of ⅛) of *the gross proceeds at the prevailing market rate,* for all gas used off said tract."

The four members of the court taking Positions 1, 2 or 3 consider this a "market value" lease, with royalties to be paid on the arbitrated market value.

(f) Flower case:

Three leases are involved in this case each covering a quarter-section. They were made subject to a unitization agreement (together with the fourth quarter of the section) which didn't directly affect the royalty clauses, but gave to each lessor a "percentage of Royalty" (25% of ⅛) from production anywhere in the section. The royalty clauses are:

"The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, one-eighth (⅛) *of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (⅛) of its market value at the well."*

"The lessee shall pay lessor, as royalty, one-eighth of *the proceeds from the sale of the gas, as such,* for gas from wells where gas only is found, and where not sold shall pay Fifty ($50.00) Dollars per annum as royalty from each such well. . . ."

"To pay the lessor one-eighth, *at the market price at the well* for the gas so used, for the gas from each well where gas only is found, while the same is being used off the premises. . . ."

The first of these is a *Waechter* lease, and is deemed a "proceeds" lease under the decision in the Lightcap case, (a) above. The second is clearly a "proceeds" lease, and is controlled by the decision in the Stewart case, (d) above. The third is a "market value" lease, and is controlled by the Maupin case, (c) above.

### IV. *Mobil's Counterclaim*

In its answers Mobil counterclaimed for alleged overpayments of royalties to plaintiffs from January 1, 1954, through January 31, 1958. During that period royalties were paid on a sales price of 11¢ per Mcf under both contracts between Mobil's predecessor and Northern; that price was fixed by a minimum price order of the Kansas corporation commission entered December 2, 1953. A decision of this court upholding the KCC order was reversed in *Cities Service v. State Comm'n.*, 355 U. S. 391, 2 L. Ed. 2d 355, 78 S. Ct. 381, decided January 20, 1958. The prices called for in the contracts, which would have governed but for the invalidated minimum price order, were 8.74¢ per Mcf under the "A" contract and 7.15¢ per Mcf under the "B" contract (adjusted in each case for the standardized pressure of 14.65 psia).

When the KCC minimum price order was first promulgated Northern advised Mobil's predecessor that it would comply only under protest, and would expect a refund if the KCC order were found to be invalid. Mobil's predecessor in turn advised its royalty owners that the validity of the order was subject to litigation, and advised each that acceptance of royalty checks based on the 11¢ order constituted an agreement to refund any part which was later determined to be excessive. Plaintiffs accepted and negotiated the checks.

After the KCC order was invalidated by the Supreme Court Northern sued Mobil's predecessor in Delaware to recover overpayments made by it under the order. That litigation was eventually settled, with FPC approval, by Mobil's refund to Northern of $2,517,522.92, or about 73% of the total paid in excess of the amount which would have been paid under the two contracts in the absence of the 11¢ order. It is the plaintiffs' "royalty share" of this 73% refund that Mobil seeks to recover through its counterclaim.

The trial court denied the claim because the payments to the royalty owners was voluntary, because the settlement with Northern was voluntary, and because the claim was barred by the statute of limitations.

The first ground was specifically rejected in *Waechter*, where there had also been overpayments under the KCC order. We said:

". . . Nor can the payments of the 11¢ price be said to be voluntary. Appellant was under compulsion of a business hazard in making them. The KCC order compelled it to pay the 11¢ minimum price 'as a condition precedent for withdrawal from the common source of supply'. If it failed to comply

with the commission order it was subject to criminal penalty under K. S. A. 55-708 and civil penalty under 55-710." (217 Kan. at 514-15.)

Neither does the fact that the settlement with Northern was "voluntary" cut off Mobil's right of reimbursement. The settlement here was reached on January 4, 1963. The dispute between Amoco, the producer in *Waechter*, and its purchaser Cities Service, had gone to judgment in favor of the purchaser on November 19, 1962. (See Finding No. 22, *Waechter v. Amoco Production Co.*, supra, 217 Kan. at 495.) Mobil could at that point readily foresee the outcome of its own case. If we analogize Mobil's right to reimbursement from its royalty holders to a right of indemnity, we find the general rule to be:

"Indemnity against losses does not cover losses for which the indemnitee is not liable to a third person, and which he improperly pays. But a person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss. The fact of voluntary payment does not negative the right to indemnity, since a person confronted with an obligation that he cannot legally resist is not obligated to wait to be sued and to lose a reasonable opportunity for compromise." (41 Am. Jur. 2d, *Indemnity*, § 33.)

See also, *Cason v. Geis Irrigation Co.*, 211 Kan. 406, 507 P. 2d 295; *Fenly v. Revell*, 170 Kan. 705, 228 P. 2d 905.

There is no contention here that Mobil had any defense to Northern's suit, or that the settlement was in any way imprudent. Plaintiffs say only that the Delaware litigation did not go to judgment, hence Mobil's liability was not "determined." Under the general principle quoted above, this is not sufficient to deny to Mobil the reimbursement to which it is otherwise entitled. It simply paid what it was legally obligated to pay.

As to the statute of limitations, it had no doubt run before the counterclaim was asserted. The cause of action accrued on January 20, 1958, when the Supreme Court invalidated the KCC order. See *Cities Service Gas Co. v. United Producing Co.*, 212 F. Supp. 116 (N. D. Okla. 1960); *Panhandle Eastern Pipe Line Company v. Brecheisen*, 323 F. 2d 79 (10th Cir. 1963). Applying the statute relating to unjust enrichment (K. S. A. 60-512) the claim became barred on January 20, 1961. (See *Waechter*, 217 Kan. at 516-17.)

This did not, however, prevent the assertion of the claim as a setoff. K. S. A. (now 1975 Supp.) 60-213 (*d*) provides:

"When cross-demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim or cross-claim could have been set up, neither can be deprived of the benefit

thereof by the assignment or death of the other or by reason of the statute of limitations if arising out of the contract or transaction set forth in the peitition as the foundation of plaintiff's claim or connected with the subject of the action; but the two demands must be deemed compensated so far as they equal each other."

Thus, even an outlawed claim may be used as a setoff if it (a) coexisted with the plaintiffs' claim and (b) arises out of the "contract or transaction" on which the plaintiffs' claim is based.

Here, plaintiffs' claims began accruing July 1, 1958, when the new, arbitrated market value came into play, and as actions on written contracts continued as viable claims for the next five years. (K. S. A. 1975 Supp. 60-511.) Plaintiffs' claims were thus "alive" from July, 1958, through July, 1963; Mobil's claim was "alive" from January, 1958, through January, 1961. They thus coexisted for at least some two and one-half years, and thereby met the first requirement of 60-213 (d). See, *Tobin Construction Co. v. Holtzman,* 207 Kan. 525, 485 P. 2d 1276.

The second requirement of the statute—that the claim arise out of the same contract or transmission—is likewise met. Both claims appear clearly to arise out of the respective leases, *i. e.,* the "same contract," even though covering different time spans. Although Mobil cannot secure affirmative relief on its outlawed claim it can use it as a matter of pure defense, *i. e.,* as a setoff against any judgment rendered against it. See, *Christenson v. Akin,* 183 Kan. 207, 326 P. 2d 313. The trial court therefore erred in denying the counterclaim *in toto.* Mobil is entitled to a setoff for its claim for overpayments, although only against that portion of the plaintiff's claims which coexisted with it (*i. e.,* those claims of plaintiffs accruing before January 20, 1961).

## V. *Interest*

The trial court's allowance and disallowance of prejudgment interest came about in this way: When the arbitrators made their award in 1958 fixing the "fair, just and reasonable" rates for sales to Northern for the next five years, Mobil's predecessor filed those rates with the FPC as its proposed new tariff. The FPC, as it was authorized to do under the Natural Gas Act, suspended the effectiveness of the new rates pending its investigation of their lawfulness.

Mobil's predecessor filed a motion asking that it be permitted to collect the new, higher rates, subject to an obligation to refund to Northern any portion which might later be found by the FPC to be excessive, plus interest at 6%.

This motion was approved, and from December 20, 1958, through the entire period in litigation Mobil and its predecessor collected from Northern at the arbitrated rates of 16.75¢ per Mcf and 15¢ per Mcf on the "A" and "B" contracts respectively. At the same time it paid royalties on the basis of the old contract rates of 8.74¢ and 7.15¢ per Mcf.

Realizing that it might have to refund at least part of its current receipts from Northern, and would have to pay additional royalties on the excess it would be permitted to retain, Mobil's predecessor established reserves for this purpose. A portion of these reserves were invested in government securities and certificates of deposit. The balance was put into the general corporate treasury and used for current operations just like any other working capital.

When Mobil bought out its predecessor (Republic Natural Gas Company) as of December 31, 1961, it acquired its assets, its liabilities, and its position in all pending litigation and administrative proceedings. Among the latter was the request for FPC approval of the new, arbitrated rates. In the spring of 1964 Mobil filed with the FPC a rate settlement proposal which included the "A" and "B" contracts with Northern. The settlement was approved by an order which became final on July 26, 1964. It approved rates covering the period in litigation as follows:

| Period | "A" Contract | "B" Contract |
|---|---|---|
| Dec. 20/58-Mar. 31/60 | 16.75¢ Mcf | 15¢ Mcf |
| Apr. 1/60-Dec. 31/61 | 11¢ Mcf | 11¢ Mcf |
| Jan. 1/62-Nov. 30/62 | 16.75¢ Mcf | 15¢ Mcf |
| Dec. 1/62-Apr. 30/64 | 11¢ Mcf | 11¢ Mcf |

(The 11¢ rate was continued as to both contracts until July 1, 1967, when it went to 12.5¢ as a result of FPC area rate setting for the Hugoton-Anadarko field.)

The result was a final determination of how much of its receipts from Northern during the period Mobil would be able to retain. Despite the apparently irrational fluctuations, the amount was, for the entire period, substantially in excess of the 8.74¢ and 7.15¢ on which Mobil had been paying royalties.

By pleading, Mobil at various times in 1964 and 1965 tendered into court the difference between the royalties previously paid and the royalties due under the FPC approved rates. (The tender was modified from time to time in ways not now material.) On April 2, 1965, the trial court ordered Mobil to pay in according to its latest tender (in which it deducted its counterclaim and offered no in-

terest) and the resulting payment was distributed to plaintiffs without prejudice to the claims of the parties—in particular plaintiffs' claims to interest.

It was on this payment that the trial court allowed prejudgment interest:

"Judgment for interest will be granted plaintiffs on the amounts received by defendant set forth in finding of fact number thirty-three herein. These are the rates received by defendant and its predecessor under the arbitration of the gas purchase agreement and approved by the FPC. Since defendant had full use and control from receipt of the money until the tender into this court equitable considerations compel the court to allow interest at the legal rate for this period plus interest thereon to this date."

The second interest question involves the additional amounts for which judgment was rendered below, based on the excess of "market value" over the FPC approved rate. When it had made good on its tender Mobil had paid all the royalties due on the amounts received from Northern which it was permitted by the FPC to retain. The judgment below, however, which we are affirming in part, for the first time established Mobil's liability for royalties over and above those it had previously paid. As to these amounts the court concluded:

"The unusual delay in concluding the litigation of these cases in which the evidentiary hearing was held in November, 1973, and proposed findings and conclusions and briefs were submitted until July 1, 1974, was the direct result of an injunction issued by the Federal District Court of this state. While directed to the parties to this litigation it effectively enjoined this court. This matter is noted because of plaintiffs' request for pre judgment interest if judgment is granted, as has been, in conclusion number four above. Plaintiffs state the delay was caused by defendant in applying for the injunction. However, the record reveals no appeal from the injunctive order and the interim litigation in the FPC and United States Circuit Court has determined the basic question of FPC jurisdiction of royalty provisions. These facts plus this being a case of initial impression leads this court to conclude that pre judgment interest should not and is not allowed as to the judgment provided in conclusion number four above."

Neither side is content with the trial court's rulings. Mobil relies on the general rule that an "unliquidated" claim for damages does not draw interest until liquidated—usually by judgment. *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.*, 176 Kan. 433, 271 P. 2d 773; *Govenius Bros. v. Reagor*, 130 Kan. 711, 288 Pac. 537, Syl. 2. The result, it says, is that no interest should be allowed at all, either on the amounts in admittedly owed, tendered and paid, or on the additional amounts adjudged to be due.

Plaintiffs, on the other hand, assert that the amount or royalties

due on the arbitrated "market value" was readily ascertainable at all times, and was therefore "liquidated" for the purpose of allowing interest, citing *Schupbach v. Continental Oil Co.,* 193 Kan. 401, 408, 394 P. 2d 1.

This court is of the opinion that the trial court was correct on both aspects of the interest problem. As to the amounts which were determined to be due only when judgment was entered below, we believe the general rule as to unliquidated claims should apply. Apart from the question of liability (one of "initial impression" as noted by the trial court), the amount due if there was liability was not determined until judgment. The "market value" of the gas sold was subject to proof at trial by any competent evidence. See *Weymouth v. Colorado Interstate Gas Company,* supra; *Lippert v. Angle,* 211 Kan. 695, 508 P. 2d 920. Here plaintiffs chose to rely on the arbitrated value as establishing market value, and that figure was accepted by the trial court in the absence of any other evidence on the issue. Such a result, however, could not have been foretold before this litigation was well under way, and until that time the total claim was unliquidated.

*Lippert v. Angle,* supra, is instructive on this issue. That was also a suit for gas royalties based on the market value of the gas at the wellhead. There, no royalties had been paid, the lessee having impounded them pending the lessors' execution of an unusual form of division order. No tender was made, even of the amounts admittedly due. "Market value" was litigated and determined, and prejudgment interest was allowed on the resulting judgment. This court affirmed, not on the basis that the claim was liquidated but because of the lessee's "unreasonable and vexatious delay of payment" under K. S. A. 16-201. In the present case the trial court found that the delay was not solely Mobil's fault, but was caused by the federal injunction pending during the time the question of FPC jurisdiction was litigated. Plaintiffs, the trial court noted, did not appeal from the injunction order, as they could have had they not been content to await the outcome of the District of Columbia suit. The clear implication is that Mobil was not guilty of "unreasonable and vexatious delay" which would justify damages by way of interest. We agree.

The money actually received by Mobil and held by it subject to the FPC order, however, stands on a different footing. When it first began receiving this money Mobil's predecessor advised each royalty owner that his royalties on the higher rates would be

placed in a "segregated account" and that after the FPC acted royalty owners would be paid out of the "impounded funds." In fact, as indicated above, the money was either invested or used in the business. As the trial court noted, Mobil and its predecessor had "full use and control" of this money.

We find a qualification to the general unliquidated damages rule in this language:

"The general rule followed by some authorities is that interest as damages cannot, in the absence of any statutory provision therefor, be recovered as a matter of right in an action of contract upon an unliquidated claim. In a growing number of jurisdictions, however, the allowance of interest on such unliquidated claim is discretionary with the court, and interest will be allowed where required to give full compensation. Therefore, where necessary in order to arrive at fair compensation, the court, in the exercise of a sound discretion, may include interest or its equivalent as an element of damages." (22 Am. Jur. 2d, *Damages*, § 185. And see, 25 C. J. S. *Damages*, § 52a.)

This type of reasoning was employed to award prejudgment interest on an unliquidated claim in *Brooklyn Union Gas Co. v. Transcontinental Gas P. L. Corp.*, 201 F. Supp. 679 (S. D. Tex. 1960), aff'd 299 F. 2d 692 (5th Cir. 1962). That was an action by gas distributors for alleged overpayments made to their ultimate suppliers, Mobil and Ohio Oil Company, through their immediate supplier, Transco. The court treated the matter as one of restitution and found that interest should be allowed under Restatement, Restitution, § 156. It also found that "the district courts are vested with considerable discretion in the awarding of interest damages upon restitutory sums. Considerations of fairness and traditional equitable principles are to guide the exercise of this discretion." (201 F. Supp. at 682.)

The defendants there contended that interest could not start until the dissolution of a previously issued stay order; in the meantime, they said, they were entitled to collect the higher rates. Their duty to repay, they argued, did not arise until the obligation became unconditional. The court's response to this argument was:

"Defendants' argument has considerable logical appeal. Yet, Mobil and Ohio have had the use of this money from the date of its receipt. Similarly, plaintiffs have been deprived of the use of such funds from the time these increased rates were reflected in Transco's charges to them. Equitable considerations compel the conclusion that interest should commence from the respective dates of Transco's overpayments to the defendants." (*Id.* at 682-3.)

We have enunciated the general principle:

"Interest has been defined as the compensation allowed by law or fixed by the parties for the use, detention, or forbearance of money. In our society today money is a commodity with a legitimate price on the market and loss of

its use, whether occasioned by the delay or default of an ordinary corporation, citizen, state or municipality should be compensable." (*Shapiro v. Kansas Public Employees Retirement System*, 216 Kan. 353, 357, 532 P. 2d 1081.)

Here Mobil and its predecessor made active use of plaintiffs' money, and plaintiffs were deprived of that use. Under the reasoning of the foregoing cases plaintiffs are entitled to be compensated for their loss. Mobil was obligated by FPC order to pay Northern 6% interest on Northern's share of the "impounded" money; equitable principles require that the royalty owners receive the same treatment as to their share. Accordingly the trial court's orders as to interest are affirmed.

## VI. *Conclusion*

The trial court's judgment is affirmed insofar as it awarded royalties on the free market value (*i. e.*, the arbitrated price) of gas sold under those leases which this court categorizes as "market value" leases, and insofar as it awarded and denied prejudgment interest. It is reversed insofar as it awarded royalties in excess of moneys actually received and retained for gas sold under the "proceeds" leases, and insofar as it denied Mobil's counterclaim. The cases are remanded for further proceedings in accordance with this opinion.

APPROVED BY THE COURT.

FATZER, C. J., concurring and dissenting:

The crux of this controversy is the amount of royalty Kansas landowners have the right to be paid pursuant to the leases before the court. The landowners claim that such royalty payments should be based on the arbitrated prices of 16.75 and 15.00 cents per Mcf fixed pursuant to the "A" and "B" contracts, respectively. Mobil claims the basis for royalty must be the rates finally approved by order of the Federal Power Commission.

During the period of this controversy, late 1958 through June 10, 1963, the contract prices in effect under the "A" and "B" contracts between the lessee and pipeline purchaser (Northern) were 16.75 and 15.00 cents per Mcf respectively. During this five-year period, Mobil and its predecessor, Republic, actually received the current contract prices of 16.75 and 15.00 cents for the gas they delivered to Northern, subject to refund should the FPC later decide these contract prices did not provide "just and reasonable" rates. During this same five-year period, Mobil paid royalties to the plaintiffs on the basis of 8.75 and 7.15 cents per Mcf, the contract prices for

the preceding five-year period (1953-1958). In late 1963 and early 1964, the appellee landowners commenced these actions to recover additional royalties which Mobil had failed to pay in accordance with its obligation under the lease contracts.

In March, 1964, Mobil filed a company-wide natural gas rate settlement proposal with the FPC involving some 200 contracts, two of which were the instant "A" and "B" contracts. The FPC approved this settlement proposal by an order which became final on July 26, 1964. The rates fixed by the order for the period of this controversy are as follows:

| Period | "A" Contract | "B" Contract |
|---|---|---|
| Dec. 20/58-Mar. 31/60 | 16.75¢ Mcf | 15.00¢ Mcf |
| Apr. 1/60-Dec. 31/61 | 11.00¢ Mcf | 11.00¢ Mcf |
| Jan. 1/62-Nov. 30/62 | 16.75¢ Mcf | 15.00¢ Mcf |
| Dec. 1/62-June. 30/63 | 11.00¢ Mcf | 11.00¢ Mcf |

It is these rates which Mobil now claims must be the measure of its royalty obligation due the appellee royalty owners.

The district court made findings of fact and entered judgment in favor of the plaintiff landowners. The majority reverses that judgment with respect to the amount of royalties due under the "proceeds" leases.

I concur in the first four paragraphs of the syllabus and corresponding portions of the majority opinion. Royalties due lessor-landowners are controlled by the terms of the gas leases. As lessee, Mobil's obligation to pay royalties to Kansas royalty owners is a question of state law—not federal law. Moreover, FPC's jurisdiction does not extend to the royalty owners or to the royalties payable under a gas lease. Consequently, full compliance with the royalty clause is not prevented by any federal regulation or order. Federal courts have clearly recognized that the basis for royalty in a gas lease may be an amount greater than the FPC ceiling rate. *Mobil Oil Corporation v. Federal Power Commission*, 463 F. 2d 256 (D. C. Cir. 1971), *cert. den.* 406 U. S. 976, 32 L. ed. 2d 676, 92 S. Ct. 2413.

I also concur in the majority's ruling on the issue of prejudgment interest and its disposition of Mobil's counterclaim.

In addition, I am in full accord with the court's ruling as to the amount of royalties the lessor-landowners are entitled to under the "market value" leases. Where the majority and I part company is in their determination that the royalties due Kansas royalty owners under the "proceeds" leases, including the so-called

"Waechter" leases, are fixed by the FPC ceiling rate. I must dissent from that portion of the majority opinion.

## I. JURISDICTION: STATE-FEDERAL

The first issue is one of jurisdiction with respect to the determination and payment of royalties under both "market value" and "proceeds" leases. On October 24, 1966, the controversy between Mobil and the plaintiff landowners pending in Kansas district courts over amounts paid and to be paid by Mobil to plaintiffs in their status as lessors or royalty owners, was referred to the FPC upon the complaint of Mobil. (*Mobil Oil Corporation v. Carl F. Matzen, et al.,* Docket No. RI 67-114.) These proceedings were consolidated with *Pan American Petroleum Corporation v. Leland C. Waechter, et al.,* Docket No. RI 67-400. Amoco Production Company is successor in interest to Pan American and was the party defendant in *Waechter v. Amoco Production Co.,* 217 Kan. 489, 537 P. 2d 228, adhered to after rehearing, 219 Kan. 41, 546 P. 2d 1320.

By order issued June 23, 1967, the FPC stated the question at issue as follows:

"The common question presented is whether royalty payments made to the lessors named in these proceedings are subject to this Commission's jurisdiction under the Natural Gas Act."

By a vote of three to two, the FPC determined it had jurisdiction under the Natural Gas Act over the oil and gas leases now before this court and the amounts of royalty payments thereunder. The purport of the decision was that royalty payments under both "market value" and "proceeds" leases could not be based on an amount in excess of the FPC ceiling rate.

The Commission was reversed in *Mobil Oil Corporation v. Federal Power Commission,* supra. *Mobil* held the FPC has no jurisdiction over a royalty owner, over oil and gas leases executed by him, or over a dispute between a royalty owner and his producer as to the amount of royalties payable under such leases.

Anyone questioning the foregoing has but to refer to *Exxon Corp.,* FPC Declaratory Order-Royalty, Docket No. RI 76-29 (May 18, 1976), wherein the FPC said:

"The Commission's jurisdiction over royalty payments by producers to lessors was rejected by the Court in *Mobil Oil Corporation v. F. P. C.,* 463 F. 2d 256 (D. C. Cir. 1972), *cert. den'd,* 406 U. S. 976 (1976). The Court held that although the Commission had jurisdiction over rates charged by a producer, it *had no jurisdiction over the rate [or price] utilized in computing the royalty payment.*" (emphasis supplied) (p. 2)

Thus, in the specific area under consideration, federal jurisdiction in which the FPC is authorized to act is limited to fixing "just and reasonable" rates charged by a producer for the protection of the consumer. *The FPC has no jurisdiction over the price utilized in computing royalty payments.*

The Constitution of the United States established a federal system of dual sovereignty. For purposes here concerned, federal jurisdiction consists of that conferred by the Constitution and valid Congressional enactments. Governmental powers not delegated to the United States by the Constitution are reserved by the Tenth Amendment to the states—or to the people. An essential feature of our dual system is that in some areas federal jurisdiction is exclusive. In others, state jurisdiction is exclusive, and in still others, federal and state jurisdiction is concurrent. (16 Am. Jur. 2d, Constitutional Law, § 198-209, pp. 433-448.)

In its broadest context, the power to regulate (and therefore to protect) commerce is an express grant of Constitutional authority to the federal government. When the federal sovereignty in this area has been implemented, state acts which are in conflict must give way. But the Constitutional provision is not a universal grant, available under any and all conditions. It is an express and specific allocation of legislative power, and it is Congress that regulates commerce among the states and with foreign nations.

The United States Supreme Court has determined that Congress, by the enactment of the Natural Gas Act, did not intend the federal government to occupy the entire field of regulatory jurisdiction to the exclusion of the states. (*Power Comm'n v. Panhandle Co.*, 337 U. S. 498, 502-515, 93 L. Ed. 1499, 1503-1510, 69 S. Ct. 1251. *Power Comm'n v. Hope Gas Co.*, 320 U. S. 591, 609-613, 88 L. Ed. 333, 348-350, 64 S. Ct. 281.) In *Power Comm'n v. Panhandle Co.*, supra, it was said:

". . . [T]he Natural Gas Act was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry. *Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other.* Congress enacted this Act after full consideration of the problems of production and distribution. It considered the state interests as well as the national interest. It had both producers and consumers in mind. Legislative adjustments were made to reconcile the conflicting views." (emphasis supplied) (*Id.* at 513)

In *F. P. C. v. Transcontinental Gas Corp.*, 365 U. S. 1, 5 L. Ed. 2d 377, 81 S. Ct. 435 (January 23, 1961), the Court said:

". . . Congress, in enacting the Natural Gas Act, did not give the

Commission comprehensive powers over every incident of gas production, transportation, and sale. *Rather, Congress was 'meticulous' only to invest the Commission with authority over certain aspects of this field,* leaving the residue for state regulation. *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n,* 332 U. S. 507." (emphasis supplied) (*Id.* at 8)

and further:

". . . When Congress enacted the Natural Gas Act, it was motivated by a desire 'to protect consumers against exploitation at the hands of natural gas companies.' *Sunray Mid-Continent Oil Co. v. Federal Power Comm'n,* 364 U. S. 137, 147. To that end, Congress 'meant to create a comprehensive and effective regulatory scheme.' *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n,* 332 U. S. 507, 520. See, *Public Utilities Comm'n v. United Fuel Gas Co.,* 317 U. S. 456, 467. It is true, of course, that Congress did not desire comprehensive *federal* regulation; much authority was reserved for the States." (*Id.* at 19)

We have here the clearest possible example of a gas field over which there is concurrent state and federal jurisdiction. In the area of jurisdiction to determine royalty payments, either the state or federal government regulatory power must prevail—*only one sovereign has jurisdiction.*

Clearly, Congress could have given the FPC jurisdiction to use the ceiling rate to determine royalty payments due Kansas landowners; just as clearly, *Mobil* teaches it has not done so. Congress was "meticulous" only to invest the FPC with authority over certain aspects of the interstate transportation and sale of natural gas, leaving the residue of the power to be exercised by the states. Indeed, the Commission's jurisdiction is *limited* only to that conferred by the Act—to fix "just and reasonable" rates with respect to gas moving in interstate commerce for resale to "protect consumers against exploitation at the hands of natural gas companies." No express or implied power was conferred upon the Commission with respect to lessor-landowners or their royalty interest in the natural gas produced from their land. The Act is silent concerning the use of the FPC ceiling rate to determine the lessee's royalty payments to the lessors.

The jurisdiction conferred by the Natural Gas Act was for the limited purpose of protecting the consuming public. A "just and reasonable" rate is fixed by the FPC for that purpose. Where that purpose has been exercised, the FPC's jurisdiction under the Act is exhausted. It is at an end, and may not be expanded by the courts. The rate fixed under FPC's limited jurisdiction for the purpose of protecting the consumer may not be used for another purpose—to measure the payment of royalty. *Mobil* decided the

FPC's jurisdiction under the Natural Gas Act does not extend to a royalty owner, a lease contract between the landowner and pro- ducer, or the payment of royalty thereunder, and further, that the FPC ceiling rate fixes no limit on the measure of royalty to be paid under a lease. *See, Placid Oil Company v. Federal Power Commission,* 483 F. 2d 880 (5th Cir. 1973); *Mobil Oil Corp. v. FPC,* 417 U. S. 283, 41 L. Ed. 2d 72, 94 S. Ct. 2328 (1974). *The rate fixed for a purpose within the FPC's jurisdiction may not be used for a different purpose wholly outside that agency's jurisdiction.* The FPC rate may not be used by this court as the measure of royalty under these leases.

## II. *THE ROYALTY INTEREST*

It has been deemed to be in the public interest that the consumer be able to purchase natural gas at artificially low prices. Toward this end, producers have been allowed to receive only a "just and reasonable" rate of return for the gas delivered. These rates which the producer (Mobil) may charge the pipeline carrier (Northern) are fixed by the FPC as a matter of utility rate setting. The rate is fixed to allow the producer its reasonable costs of production plus a reasonable return on its investment. The rate is derived from cost data rather than prevailing field prices. *See, e. g., Permian Basin Area Rate Cases,* 390 U. S. 747, 20 L. Ed. 2d 312, 88 S. Ct 1344; *Shell Oil Company v. F. P. C.,* 520 F. 2d 1061 (5th Cir. 1975); *Placid Oil Company v. Federal Power Commission,* supra; *In re Hugoton-Anadarko Area Rate Case,* 466 F. 2d 974 (9th Cir. 1972).

The discussion of the Court in *Shell Oil Company v. F. P. C.,* supra, sheds some light on the rate fixing process:

" . . . [T]he Commission adhered to *cost* as the basis for the new national rate. The FPC utilized the methodology developed by it in *Area Rate Proceeding (Permian Basin),* 34 FPC 159 (1965), aff'd, *Permian Basin Area Rate Cases,* 390 U. S. 747, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968), as modified in the second Southern Louisiana proceeding, *Area Rate Proceeding (Southern Louisiana),* 46 FPC 86 (1971), aff'd, *Placid Oil Co. v. Federal Power Commission,* 483 F. 2d 880 (5th Cir. 1973), aff'd sub nom., *Mobil Oil Corp. v. FPC,* 417 U. S. 283, 94 S. Ct. 2328, 41 L. Ed 2d 72 (1974) [So. La. II]. Basically the rate was determined by projecting the average cost of finding and producing 'new gas,' i. e., gas discovered after January 1, 1973, over the estimated life of the producing wells and adding a 15 percent annual rate of return. Historical items of cost were predicted for the future to attempt to insure that the producer would recover its actual expenses at the time work is done. Relating these estimated costs to the commonly accepted unit of gas sold to the consumer results in a maximum allowable rate for natural gas in cents per Mcf, i. e., thousand cubic feet." (520 F. 2d at 1066)

Factors of production cost and return on investment considered by the FPC in arriving at the "just and reasonable" rate producers may charge include the following: (1) successful well costs, (2) dry hole costs, (3) lease acquisition costs, (4) costs of other production facilities, (5) other exploration costs, (6) exploration overhead, (7) area gathering costs, (8) production operating expense, (9) production tax, (10) recompletion and deeper drilling cost, (11) *royalty expense*, (12) regulatory expense, (13) net liquid credit (subtracted from costs), (14) return on production investment, (15) return on working capital. *See, Shell Oil Company v. F. P. C.*, supra; *Placid Oil Company v. Federal Power Commission*, supra.

Royalty, it will be noted, is one of the producer's expenses which is considered in arriving at the ultimate FPC rate. The amount paid by the producer to the royalty owner is an expense just as the wages paid to his drilling crews and the price he pays for the pipe he sinks in the ground. These other costs are controlled by market forces. Royalty should be treated no differently.

Area rates do not take into account cost variances of individual producers. *Placid Oil Company v. Federal Power Commission*, supra. If royalty costs or other costs incurred by a particular producer are higher than those contemplated by the FPC in establishing the rate, that producer may seek individualized relief. *See, Mobil Oil Corp. v. FPC*, supra.

The final company-wide rates established by the FPC in the instant action share a common basis with area rates and national rates—all are based on the producer's costs. In its settlement negotiations with the FPC, Mobil presented *company-wide* cost of production information. The record indicates Mobil did not present specific cost information on its production under the instant "A" and "B" contracts (two of some 200 contracts involved in the company-wide settlement). Had Mobil chosen to do so, it could have presented its royalty costs under the "A" and "B" contracts to the FPC on the basis claimed by the appellee royalty owners since these cases were pending when Mobil filed its settlement proposal. All the rates established for the five-year period involved in this controversy were determined by the producer's company-wide cost of production. Even the two periods totaling some 24 months Mobil was allowed to retain the full contract price it had received were determined by an analysis of Republic's (Mobil's predecessor) and Mobil's revenue and costs of production.

The FPC rate is totally unrelated to the value of the commodity gas. For the benefit of the consuming public, the rate is set to give the producer a reasonable return on its production costs and investment. It need only be high enough to avoid being confiscatory. *FPC v. Texaco Inc.*, 417 U. S. 380, 41 L. Ed. 2d 141, 94 S. Ct. 2315. *Neither the value of the gas nor the price it will command in the unregulated marketplace is taken into consideration in fixing the FPC rate. The gas is, in essence, being given away. The FPC controlled rate which the producer receives is not in payment for the commodity gas; it is to cover the producer's costs and provide a certain return on the producer's investment.*

With respect to "proceeds" leases, the majority says the measure ·of royalty is the FPC rate which the lessee-producer receives for the gas. *To say that a landowner's share of gas produced on his land is to be measured by the producer's cost of production,; which is totally unrelated to the value of the gas and which is reflected by a rate fixed for the purpose of protecting the consuming public by an agency having no jurisdiction over the royalty owner, his lease, or the amount of his royalty payment, is, in my judgment, incongruous. This offends my sense of logic. It taxes credulity to the breaking point.*

All royalty clauses, whatever the language, deal with the same interest of the landowner—royalty. "Royalty" is the landowner's share in the oil and gas actually produced which is paid as compensation for the right to drill and produce. *See, Magnusson v. Colorado Oil and Gas Corp.*, 183 Kan. 568, 331 P. 2d 577; *Skelly Oil Co. v. Cities Service Oil Co.*, 160 Kan. 226, 160 P. 2d 246; *Rutland Savings Bank v. Steele*, 155 Kan. 667, 127 P. 2d 741. The landowner's royalty interest is not a share of the producer's cost of production. It is not a share of an amount totally unrelated to the value of the commodity gas. It is not a share of an amount fixed for the protection of the consuming public by an agency that has no jurisdiction over the landowner or his lease. The landowner's royalty interest *is a share in the value of the gas* actually produced. Because the physical properties of gas do not permit its being stored, the royalty owner takes his share of the commodity in the form of dollars rather than a share of the gas itself. But, royalty is still tied to the *gas* produced. *Gas—the commodity—is at the heart of the royalty obligation of all gas leases. Gas—the commodity—does have a value in the market. The FPC rate which is neither related to or based on the commodity gas or its value in*

*the market simply cannot be, in logic or in law, the measure of the landowner's royalty interest in the gas produced on his land.*

Relying on *Waechter v. Amoco Production Co.,* 217 Kan. 489, 537 P. 2d 228, adhered to after rehearing, 219 Kan. 41, 546 P. 2d 1320, the majority summarily decides the FPC rate is the measure of royalty under the "proceeds" leases now before this court. *Waechter,* in my opinion, was incorrectly decided. Relying on it here compounds the error.

*Waechter* noted that "proceeds" and "market value" royalty clauses are not the same. It said that under a "proceeds" lease, the lessor chooses not to be tied to the uncertainty of the market, but instead chooses to take his royalty share from whatever the lessee can get for the gas—relying on the lessee's economic self-interest to obtain the best price possible. Under this rationale, whatever amount the producer receives must be the measure of royalty. While I understand this distinction, I do not think it can be stretched to the point of completely breaking away from the commodity gas which is the basis for royalty. Under a "proceeds" lease, is it possible the lessor contemplates the price received and his royalty share will be determined by something other than the commodity gas? Surely if the landowner's royalty interest is in a share of the value of the gas produced, his royalty payment will be determined by, or at the very least be related to, the value of the commodity gas regardless of whether his lease calls for a royalty share of the market value of the gas or the proceeds of the sale of the gas.

"Proceeds" and "market value" are both measures of the lessee's royalty obligation—an obligation which commands payment to the lessor for a portion of the gas produced. Both are related to the commodity gas and its value. This common aspect of the royalty obligation of all gas leases has not gone unnoticed. One commentator has observed that while a literal distinction can be made between "proceeds" and "market value" royalty provisions, in practice, courts seem to apply the same standard—market value at the wellhead—whether a lease predicates royalty on "proceeds," "market value" or "market price." *See,* Siefkin, *Rights of Lessor and Lessee with Respect to Sale of Gas and as to Gas Royalty Provisions,* Fourth Oil and Gas Inst. 181, 214 (Matthew Bender 1953), and cases cited therein. Professor Sneed, after recognizing that proceeds does afford a different standard than market price or market value, says the parties probably contemplate this standard

will yield no different return from any other standard. Sneed, *Value of Lessor's Share of Production Where Gas Only Is Produced,* 25 Tex. L. Rev. 641, 655 (1947).

Some of the leases themselves illustrate the common basis underlying both the "proceeds" and "market value" types. The modified Parker lease provides:

". . . (⅛) of the gross proceeds at the prevailing market rate. . . ."

If "proceeds" means actual sales price, and "market rate" means the market value for the gas, this clause is obviously contradictory. It can have only one meaning: out of the "proceeds" the lessee realizes, the lessor shall be paid royalty for the gas produced on the basis of market value at the well.

When one recognizes the common element in all gas royalty clauses—a share of the value of the commodity gas produced—it becomes clear that the meaning of proceeds just stated above must apply to all the "proceeds" leases before the court. The FPC rate imposed on the producer is completely unrelated to the gas produced or its value. It is a utility rate based essentially on costs of production. In this case, the arbitrated contract price of the "A" and "B" contracts is the only evidence of the market value of the commodity gas. This contract price and not the FPC rate is tied to the gas produced and its value. This value must serve as the basis for the lessor's royalty share under the proceeds leases. *Out of the proceeds the lessee realizes from the sale of the gas produced, the lessor should be paid his royalty share on the basis of the market value at the well as evidenced by the arbitrated contract prices.*

It is well established that the landowner's royalty share of the gas produced is free of the costs of production. In 3 Williams & Meyers, Oil and Gas Law, § 643.2, p. 529 (1975), it is said:

"Inasmuch as gas royalty is ordinarily payable in money rather than in kind and is measured by value or proceeds at the wellhead, it is not customary, as in the case of the oil royalty payable in kind, to specify that the royalty is free of cost of production. *Freedom from such costs of production is implicit in the provision for payment of a share of the proceeds or value at the wellhead."* (emphasis supplied)

In *Johnson v. Jernigan,* 475 P. 2d 396, 399 (Okla. 1970), the court stated:

". . . 'Gross proceeds' has reference to the value of the gas on the lease property without deducting any of the expenses involved in developing and marketing the dry gas to this point of delivery."

Given the proposition that royalty is free of the costs of production, using the FPC rate as the basis for determining royalty creates a paradox: royalty, which is not to be burdened with any costs of production, is determined by a rate based on costs of production. Surely, this cannot have been the result intended by the parties.

Justice Fromme would have the FPC rate serve as the basis for royalty under both "proceeds" and "market price" (he distinguishes between market price and market value) royalty clauses. He says that although the two types of royalty clauses are different, such difference does not prevent the amount received as "proceeds" from adding up in dollars to as much as that received as "market price."

I do not agree with his view that the FPC rate may serve as the basis for royalty. I do, however, agree that the amount of royalty may be the same in dollars under both "proceeds" and "market value" leases. As I have pointed out at length, the FPC rate is foreign to the basic nature of the royalty interest. The FPC rate is ill-suited to serve as the measure of royalty under "proceeds" leases. Market value can and must serve as the measure of royalty under both the "market value" and "proceeds" leases now before this court. Under the circumstances at hand, the one-eighth royalty payment under both types of leases simply amounts to the same in dollars.

The majority makes a distinction between "proceeds" and "market value" leases, but fails to recognize another distinction: proceeds in a regulated and an unregulated market. As noted in *Texaco, Inc. v. Federal Power Commission,* 474 F. 2d 416, 422 (D. C. Cir. 1972):

". . . [an unregulated industry] is governed by the market while . . . [a regulated industry], by definition, is the subject of active governmental control."

The market value of gas and the "just and reasonable" rates mandated by the Natural Gas Act are two separate and distinct things. *FPC v. Texaco Inc.,* supra.

Proceeds in the form of an imposed, governmentally controlled cost of production rate are certainly not equivalent to the proceeds from a sale of gas in an unregulated market. The former is a sum commanded by cost factors unrelated to the commodity gas or to its price or value. The latter is a sum commanded by the *gas* produced. Royalty based on the proceeds from a sale of gas in an unregulated market is necessarily tied to the value of the gas, because it is the gas that commands the price received by the producer. Royalty based on proceeds in the form of the FPC ceiling

rate is at odds with the royalty interest—a share of the value of the gas produced.

## III. *THE LEASE CONTRACTS*

It is fundamental that royalty due a lessor-landowner is controlled by the terms of the gas lease. Such leases are contracts. They are governed by the common law of this jurisdiction. I am not unmindful of the well-established rules for the interpretation and construction of contracts. The cardinal rule is to ascertain the intention of the parties at the time they entered into the contract and to give effect to that intention if it can be done consistent with legal principles. *See, e. g., Mobile Acres, Inc. v. Kurata,* 211 Kan. 833, 508 P. 2d 889; *First National Bank of Lawrence v. Methodist Home for the Aged,* 181 Kan. 100, 309 P. 2d 389. Courts first look to the language used by the parties to ascertain their intent. The language of an oil and gas lease contract will be given its ordinary and commonly understood meaning when no reason appears for doing otherwise. *Skelly Oil Co. v. Savage,* 202 Kan. 239, 447 P. 2d 395, 38 ALR 3d 971; *Collier v. Monger,* 75 Kan. 550, 89 Pac. 1011. In my judgment, the fact that the FPC rate is totally unrelated to the commodity which serves as the basis for royalty provides ample reason for doing otherwise.

In the face of the paradox created by using a cost basis utility rate as the measure of royalty for the gas produced, this court is fully warranted in construing these lease contracts to ascertain what the parties intended. The foregoing portions of this dissent clearly show these "proceeds" lease contracts may be understood to reach a meaning other than that ascribed by the majority. Where the language of a lease may be understood to reach two or more possible meanings, resort to rules of construction is proper.

The circumstances and conditions existing when an agreement was made may sometimes aid the court in clarifying the real intentions of the parties. *E. g., Amortibanc Investment Co. v. Jehan,* 220 Kan. 33, 551 P. 2d 918; *Skelly Oil Co. v. Savage,* supra. The "proceeds" leases in question were executed during the period of January 11, 1938, to November 18, 1942. The Natural Gas Act was enacted on June 21, 1938. 15 U. S. C. § 717 *et seq.* It was not until June 7, 1954, in the decision of *Phillips Petroleum Co. v. Wisconsin,* 347 U. S. 672, 98 L. Ed. 1035, 74 S. Ct. 794, that the United States Supreme Court determined the Federal Power Commission was authorized under the Natural Gas Act to regulate the rates chargeable by the lessee now before this court.

It is obvious that when the parties executed the leases, they intended the "proceeds" would result from a sale in an unregulated market. In the free market, it is the *gas* that commands the amount received by the producer, rather than an artificial rate based upon production cost factors and determined as a matter of utility rate setting for the benefit of the ultimate consumer. It seems clearly contrary to the intention of the parties to say that the measure of royalty under the "proceeds" leases should be the FPC regulated utility rate received for the gas produced. Instead, it may be said the parties intended the lessors' royalty share of production denominated as "proceeds from the sale of gas" would result from a sale in an unregulated market and be based on gas produced and related to the value of that gas.

Another aid in construing provisions of a contract susceptible to more than one meaning is the conduct of the parties thereto subsequent to its execution. When such terms have been construed and acted upon by the parties themselves, such construction will be adopted, even though the language used may more strongly suggest another construction. *Desbien v. Penokee Farmers Union Cooperative Association,* 220 Kan. 358, 552 P. 2d 917.

The district court found the conduct of the parties reflected an intention that royalty be based on the value of the gas. That finding is supported by substantial evidence. From the time production on these leases started until June 30, 1953, the gathering system utilized for delivery of the gas to the pipeline purchaser was owned by the lessee-producer. Sales, therefore, were not at the wellhead, but off the leased premises. The price paid for the gas and the basis for royalty was the price established by contract between the lessee-producer and the pipeline purchaser. The contract price and measure for royalty were related to and determined by the value of the gas produced.

On June 30, 1953, the producer and pipeline entered into a contract transferring the gathering system to the pipeline. Sales were thereafter at the wellhead. On that same date, the contracts governing the sale of gas from producer to pipeline were amended. The contract price was increased substantially. Royalty payments under the amended contracts were again based on the contract price which was determined by the market value of the gas.

The foregoing conduct does not bear out the assertion the parties intended royalty payments be based on the producer's cost of production—the FPC rate. In transferring its gathering system to

the pipeline, the producer decreased its costs. Yet the contract prices renegotiated at the same time were increased. It is clear that producer costs were not material to the basis for royalty payments. *The history of royalty payments under the leases clearly shows a practice of measuring royalty against the value of the gas without reference to costs. Royalty payments were the same under all the leases, whatever the language of the royalty clause.*

Another rule of construction deserves consideration. In construing a contract, reasonable rather than unreasonable interpretations are favored by the law, and results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided. *Garvey Center, Inc. v. Food Specialties, Inc.,* 214 Kan. 224, 519 P. 2d 646.

*It cannot be disputed the FPC rate in no way reflects the value of the commodity gas. Neither can it be disputed that the rate is paid for development and production costs and not for the gas itself. It is manifestly clear that to allow such a rate to serve as the basis for royalty totally divorces royalty from the commodity on which it is based.* This is an absurdity.

An equally unreasonable result is illustrated by the three leases in the *Flower* case. These three leases were made subject to a unitization agreement. Accordingly, all acreage burdened by those three leases is in a single unit, and gas produced from the three leases is from a single well. One of the leases is "market value"; the other two, "proceeds." Under the majority opinion, the same gas from the same well will be subjected to two different measures for determining the royalty payments due lessors.

To interpret these "proceeds" leases as calling for the FPC ceiling rate as the measure of proceeds is unreasonable for an even more basic reason. The federal courts have held the FPC has no jurisdiction over the lease contract between landowner and producer nor over the payment of royalty thereunder. These same courts have said that the FPC ceiling sets no limit on the measure of royalty under the leases. To say, as does the majority, that the FPC rate is the measure of royalty under these "proceeds" leases is to do by indirection what the federal courts did not do directly. The majority's interpretation of these lease contracts is restrictive, unwarranted and unwise. It renders the judicial and administrative proceedings culminating in *Mobil Oil Corporation v. Federal Power Commission,* supra, an exercise in futility. *Royalty payments, at the FPC ceiling rate which were held inapplicable in Mobil for lack of*

*jurisdiction, have now been reinstated by the majority of this court as the basis of "proceeds" royalty payments.*

One final rule of construction should be noted. The construction of an oil and gas lease subject to more than one interpretation is in favor of the lessor and against the lessee. *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P. 2d 602. The reason for this rule is simple. The lessor almost never has a part in the preparation of the lease; the lessee, who either prepared the lease or chose the form, has the opportunity to protect itself through the language employed in the lease. Construing these "proceeds" leases in favor of the lessors brings me back to where this dissent began. Royalty arises from the gas produced and its measure is related to the value of that gas. From the lessee's proceeds, the lessor's royalty share is to be paid on the basis of the market value at the well as evidenced by the arbitrated contract prices. "Proceeds from the sale of gas" must be construed to mean proceeds obtained or obtainable in the absence of cost-oriented regulation of the producer. "Proceeds from the sale of gas" must mean proceeds at the prevailing market value.

## CONCLUSION

The "A" and "B" contracts cover all the gas produced from numerous gas wells under 644 leases on about 129,220 acres in Stevens and Morton Counties. The leases involved take a number of different forms and have several variations of royalty clauses. The case at bar, to a large extent, will control the additional royalty due under these leases. The intention of the parties to the leases, as expressed through the words "market value," "market price," "proceeds from the sale of gas," "gross proceeds at the prevailing market rate," and "proceeds," was that such values, prices, rates and proceeds were to be determined in the unregulated market for the commodity gas to be produced. The fortuitous selection of "market value" lease forms one day and "proceeds" lease forms the next by the so-called "lease hound" who first acquired the leases from the lessor-landowners should not be allowed to affect this intention. It was not the intention of any of the parties that, in using such words in any of the leases, royalty payments should be based upon the lessee's cost of production. The reverse is true— royalty was to be paid free and clear of consideration of the lessee-producer's costs.

Throughout the years, the lessee-producer has interpreted all of the various lease provisions as requiring the same per Mcf basis

of payment of royalty; Mobil may not now contend that various lease provisions have a different legal effect as applied to the payment of royalties.

The intention of the parties to the "A" and "B" gas purchase contracts, which were amended and placed into effect prior to *Phillips* (June 7, 1954), were frustrated by the cost-related FPC regulations of the lessee-producer. As indicated, both parties to these contracts complied with them during the five-year period in question. Thereafter, refunds were made by Mobil pursuant to orders of the FPC in the exercise of its jurisdiction under the Natural Gas Act and rate schedules were filed adjusting prices downward despite the contractual provisions of the "A" and "B" contracts for higher prices. In my opinion, the intentions of the parties to the "A" and "B" contracts have given way, as a matter of law, to the Natural Gas Act.

A different situation exists with respect to the intention of the parties as to lease contracts before this court and to royalty payments thereunder. Under *Mobil* the lessors and royalty payments are not subject to the Natural Gas Act or to regulations or orders of the FPC. Hence, common-law determination of such intentions may be made and the lease contracts construed on common law principles without reference to cost-related FPC regulations fixing the producer's charges under the gas purchase contracts. Likewise, common law remedies are available to the lessor-landowners to recover the value of the commodity gas at the wellhead, irrespective of the type of royalty provision under consideration.

While, generally speaking, "market value" in the traditional sense is not the equivalent of "proceeds from the sale of gas," when the district court has determined pursuant to state common law remedies that market value of the gas is the measure of royalty under all the leases, such amounts may be awarded. As indicated, "proceeds from the sale of gas" should be construed to mean proceeds at the prevailing market value. Under the circumstances, the differing language of the royalty clauses does not prevent the amount awarded for "market value" leases from being the same in dollars as that awarded as "proceeds"; payments under both royalty clauses simply amount to the same in dollars.

Based on the foregoing portions of this dissent, I conclude:

(1) Since neither the jurisdiction of the FPC under the Natural Gas Act nor the purpose of the Act extends to the determination of royalties under a gas lease contract, and since the FPC

ceiling rate is determined as a matter of utility rate setting based on factors of production costs and return on investment totally unrelated to the gas itself or to its value and is fixed for the protection of the consuming public, and since the value of the gas is at the heart of the royalty interest which is free of the costs of production, I would hold that, as a matter of law, the FPC rate may not be used by this court as a measure of royalty in gas lease contracts between Kansas landowners and the lessee-producer.

(2) If a further reason need be stated for holding the FPC rate may not be the measure of royalty under "proceeds" leases, it may be found in their construction. It is obvious that when the leases were executed, the parties did not intend the FPC rate to be the measure of royalty. "Proceeds from the sale of gas" must be construed to mean proceeds obtained or obtainable in the absence of cost-oriented regulation of the producer—*i. e.,* proceeds at the prevailing market value.

(3) Market value as evidenced by the arbitrated contract prices should be the measure of royalty under all the leases before this court. Such a holding is consistent with the holding in *Mobil,* with the underlying basis of the royalty interest and with the intention of the parties.

(4) The judgment of the district court with respect to the measure of royalty under all the leases should be affirmed.

(5) The foregoing reasons, which mandate affirmance of the district court's judgment with respect to both the "market value" and "proceeds" leases, are equally applicable to the leases in *Waechter v. Amoco Production Co.,* supra, which the majority there characterized as "proceeds" leases. Those very leases were involved in the proceedings resulting in the decision of *Mobil Oil Corporation v. Federal Power Commission,* supra. Those leases, just as the ones now before this court, are subject to the teaching of *Mobil.* Yet, the majority's opinion in *Waechter* did not *cite, apply, discuss, distinguish* or *comment* upon *Mobil* or its relationship to that case. For that reason, *Waechter* cannot be said to announce any applicable controlling principle of law with respect to questions of payments of royalty before this court. I did not participate in *Waechter,* but I agree with Justice Schroeder's dissenting opinion there in which Justice Kaul joined. *Waechter* should be overruled, and this court's mandate recalled and judgment entered for the plaintiffs in that case.

Schroeder, J., concurring and dissenting:

I would affirm the trial court's decision and identify with "Position 1" indicated in the court's opinion. The reasons for my dissent herein are fully stated in my dissenting opinion in *Waechter v. Amoco Production Co.*, 217 Kan. 489, 521, 537 P. 2d 228.

Kaul, J., concurring and dissenting: I joined in Justice Schroeder's dissent in *Waechter v. Amoco Production Co.*, 217 Kan. 489, 537 P. 2d 228, on the premise the royalty clause in the prototype lease involved therein was ambiguous and, for reasons stated in the dissent, must be construed as a "market value" lease. Therefore, consistent with my position in *Waechter*, I would affirm the trial court's decision as to the Lightcap, Cutter and first Flower lease (denominated as *Waechter leases* in the court's opinion). I identify with "Position 3" as indicated in the court's opinion and concur therein in all other respects.

Fromme, J., concurring and dissenting:

As one of the three members of this court categorized in the opinion of the court as holding Position 4, I feel it necessary to explain our reasons for that position. The judgment of the lower court should be reversed as to all leases whether they call for payment of royalty based on "market price" at the well or "proceeds" at the well. Under the facts of this case they both add up to the same in dollar amounts. We agree that the royalty obligation under a gas lease is a question of state law, to be determined from the terms of the lease. However, the dollar amount of royalty due under a lease for gas produced and obligated for interstate sale can be indirectly affected by federal price regulation.

The opinion of the court properly disposes of the royalty claims on those leases which call for payment of royalty based on a share of the "proceeds" at the well. See *Waechter v. Amoco Production Co.*, 217 Kan. 489, 537 P. 2d 228, aff'd on reh. 219 Kan. 41, 546 P. 2d 1320. Accordingly, the lower court's judgment is properly reversed as to the Lightcap, Cutter, Stewart and the first two Flower leases.

However, as to the Maupin, Parker and the third Flower leases, we feel the court is in error in denominating them "market value" leases and in affirming the lower court's judgment as to them. These three leases call for the payment of royalty based on the "market price" of the gas at the well. In interpreting the meaning of the terms "market price" and "proceeds" as used in the leases certain matters should be considered.

These leases were executed prior to production and prior to the time a market had been obtained for gas. The lessors executed these leases and the lessees agreed to explore, produce and market any gas found in paying quantities. For this privilege the lessees agreed to pay royalties to the lessors based upon one-eighth of the gas produced. This one-eighth of the gas was to be marketed along with the seven-eighths belonging to the lessee-producers. All leases provided that the value of the gas to be sold from the leases was to be determined at the well unless sold off the leased premises. All of the gas from these leases has been sold at the well to a pipeline company which has its own gathering system and picks up the gas at the wellhead. At the time the first gas was produced there was no local market, and in order to fulfill its marketing covenants the lessee-producer had to obligate all production to the pipeline company which had developed markets in other states. The pipeline company is to pay for the gas as it is produced and metered into its gathering system. The entire payment is to be made to the lessee-producer who in turn is obligated by the lease to pay the lessor one-eighth royalty based either on the "proceeds if sold at the well" or at the "market price at the well", depending on the wording in the respective leases.

Some thirty-five years have passed since the leases were executed. Gas has been discovered. The gas has been obligated to the pipeline company which has a developed market. Federal and state controls have been placed on production and the price to be paid for the gas by the pipeline company is now controlled by the Federal Power Commission (FPC).

In construing the royalty provisions in these leases we attempt to discern the intention of the lessor and the lessee at the time of the execution of these leases, i. e., before production began, before a market existed, before a gathering system was engineered, before the interstate market was obtained and before FPC controls were applied. So, what is a reasonable construction of the language in these leases? The rights of the parties to share in the economic benefits of the production were based upon a one-eighth and seven-eighths division. This division was to be determined by a measurement of the gas at the well. The lessee-producer was obligated under the lease to market all of the gas produced. The gas was marketed and sold to the pipeline company for the best price obtainable. The best price obtainable by the lessee-producer was cut back to 11 cents per mcf by the Federal Power Commission. With

this in mind can it now be said that the parties intended the lessor to receive 15 or 16 cents per mcf on his one-eighth and the lessee receive 11 cents per mcf on his seven-eighths of the gas produced and sold at the well to the same purchaser? We think not. When the gas is committed to an interstate market at a controlled price on every cubic foot produced, we believe it was the obvious intention of the parties for the lessor to receive one-eighth and the lessee to receive seven-eighths based upon the best price available. The parties to these leases intended to measure the royalty as a fractional share of production. The mutual interests of the parties in such case would assure the lessor-owner of the best price available, for an increase in price would result in one-eighth to the lessor-owner and seven-eighths to the lessee-producer.

There can be no question that in the present case the lessee fulfilled the duties imposed upon it by these leases to use diligence in obtaining the best price available for the gas produced. The trial court in its third conclusion stated: ". . . The court further finds that the lessee has in good faith negotiated for the best prices available during all periods of time to date." The trial court further found that ". . . the most economically feasible market available at the time the gas was marketed from the leases involved in these cases was the interstate market."

Considering the above findings of the trial court the only remaining question should be—has the lessee accounted to the lessors for the royalty fraction of all monies received and retained by it as payment for such gas? This question was stipulated in the affirmative by the parties at a pre-trial conference. The pre-trial order controls.

An examination of the majority opinion discloses that the term "market value" is used as to royalties to be paid under the present leases. The correct term is "market price". The distinction is pointed out in *Shamrock Oil & Gas Corporation v. Coffee,* 140 F. 2d 409 (5th Cir. 1944), cert. den. 323 U. S. 737, 89 L. Ed. 591, 65 S. Ct. 42, where it is said:

"Market price is the price that is actually paid by buyers for the same commodity in the same market. It is not necessarily the same as 'market value' or 'fair market value' or 'reasonable worth'. Price can only be proved by actual transactions. Value or worth, which is often resorted to when there is no market price provable, may be a matter of opinion. There may be wide difference between them. . . ." (pp. 410, 411.)

The effect of such a distinction, if recognized in the present case, is apparent. Market value does not comprehend actual sales.

If sales are made, a market price is established. The sales, of course, must be comparable and under terms and conditions similar to the terms and conditions involved in the contract under consideration. If there have been such sales and a market price has been established, then opinions and estimates of experts as to what the buyers should have paid are entirely irrelevant to establishment of the market price. An arbitrated figure would likewise be irrelevant.

In our present case the leases provide for royalty based on either "market price" at the well or "proceeds" if sold at the well. None of the gas was used or marketed off the leased premises. The term "market value" at the well appears in these leases only with reference to royalties if the gas is marketed *off the leased premises*. Therefore the repeated use of the terms "market value" and "market value leases" is improper, misleading and creates confusion.

The exact wording of the present leases with reference to royalty payments when the gas is purchased and metered at the wells is as follows:

(a) The Lightcap lease,

"The lessee shall monthly pay lessor . . . one-eighth (⅛) of the *proceeds* if sold at the well, . . ."

(b) The Cutter lease,

"The lessee shall monthly pay lessor . . . one-eighth (⅛) of the *proceeds* if sold at the well, . . ."

(c) The Maupin lease,

"To pay the lessor one-eighth, at the *market price* at the well for the gas so used, . . ."

(d) The Stewart lease,

"The lessee shall pay lessor, as royalty, one-eighth of the *proceeds* from the sale of the gas, as such, . . ."

(e) The Parker lease,

"Lessee shall pay Lessor for gas from each well where gas only is found (a) that is located on Parent Tract, the equal fifteen one-hundredths of one-eighth (15/100 of ⅛) of *the gross proceeds at the prevailing market rate,* for all gas used off said tract."

(f) The Flower leases,

(1) "The lessee shall monthly pay lessor . . . one-eighth (⅛) of the *proceeds* if sold at the well, . . ."

(2) "The lessee shall pay lessor, as royalty, one eighth of the *proceeds* from the sale of the gas, as such, . . ."

(3) "To pay the lessor one-eighth, at the *market price* at the well for the gas so used, . . ." (Emphasis supplied.)

None of these leases call for payment of royalty based on market value.

The argument is made that there is no distinction between a "proceeds" and a "market price" royalty clause. We have held otherwise. (*Waechter v. Amoco Production Co.*, supra.)

The lessee does not seek to avoid its obligation to secure a market at the best price obtainable. It is not disputed that such a market was obtained by the lessee and the trial court so found. There is no evidence that the prices obtained were inferior to prices for any other gas being marketed from the field during this same period. The lessee recognizes there is a significance in the differing language of the royalty clauses. However, such a difference does not prevent the amount received as "proceeds" from adding up in dollars to as much as that received as "market price". The trial court found the lessee had obtained the best prices obtainable for the gas and the record shows the prices so obtained were the maximum prices permitted under the FPC guidelines and ceilings for the period in question. Under these circumstances the one-eighth royalty payments under both "proceeds" and "market price" royalty clauses simply amount to the same in dollars.

In *Waechter v. Amoco Production Co.*, supra, this court determined that the terms "proceeds" and "market price" were not equivalents. However, the dollar amounts arrived at by applying these different terms can ultimately add up to the same dollar amounts. In *Waechter* it was said:

". . . Proceeds ordinarily refer to the money obtained by an actual sale. This connotation is not without significance in the gas business. Where the sale is at the wellhead the lessor does not consent to the uncertainties of what the market or fair value or price of the gas may be—he is willing to take what the lessee sells it for, relying on the lessee's self-interest in obtaining the best price possible. Under the usual lease for every dollar the lessor receives the lessee receives seven. Where sale is off the leased premises market value at the well comes into play in determining royalty but other factors also may play a part in determining the parties' intention, such as items of expense away from the wellhead, other sales and the like, in determining just what that market value is. In such situation there is no real sale at the wellhead from which proceeds are derived. Contrariwise, where gas is sold at the wellhead there are 'proceeds' of that sale—the amount received by the seller from the purchaser." (p. 512.)

The existence of regulation is a limiting factor on the royalty bases under a "market price" lease just as surely as it is under a "proceeds" lease. In the absence of regulation the "willing buyer-willing seller" concept would apply to "market price" leases, not to

"proceeds" leases. This is in accord with our holding in *Lippert v. Angle,* 211 Kan. 695, 508 P. 2d 920, where we held:

"Market value of property may be shown by independent proof of comparable sales. To be comparable the sales must be similar or under substantially similar conditions. Mere similarity as to some particulars is not sufficient where gross dissimilarity exists as to other factors which have a bearing on value." (Syl. 1.)

The majority opinion completely disregards the question of what evidence may be necessary to establish a "market price". There was no evidence of market price in the record of this case except the FPC ceiling price. In *Waechter* the question of what effect a controlled market might have on royalties under "market price at the well" leases was not reached. The leases considered in *Waechter* were stipulated by the parties as "proceeds at the well" leases.

In the present case the lessors argue that certain aborted arbitrated figures on reasonable value somehow establish "market price at the well". Not so.

The lessee-producer, in an effort to secure an increase in the sale price to be paid by the pipeline company, thus benefiting both it and the lessors, obtained an agreement from the pipeline-purchaser to obtain an increased price by arbitration. It was agreed the arbitrated price in the final analysis was to depend upon approval by the FPC. The agreement to submit the question to arbitration stated:

"The decision of the arbitrators in accordance herewith in their determination of the questions hereby submitted shall be binding upon the parties hereto, who do mutually agree and covenant to and with each other that such decision and award shall in all things by them and each of them, and by their successors and assigns, be well and faithfully kept, observed, and performed, subject, however, to applicable laws and the rules, regulations and orders of any regulatory body properly exercising jurisdiction regarding such price."

In accordance therewith a fair and reasonable price for the gas was determined without regard to one factor having a bearing on value, *i. e.,* federal regulatory ceilings to be set by the FPC. Evidence of comparable sales to establish reasonable market value, as enunciated in *Lippert v. Angle,* supra, must include sales made under substantially similar conditions. The final FPC determination was a factor having a bearing on value and the arbitration proceedings were initiated and conducted with the understanding that the arbitrated value would not be binding upon the parties until approved by the FPC. The FPC refused to accept the arbitrated figure as a fair and reasonable price for the gas. Under these

circumstances how can it be said that the fair and reasonable market price for this gas is the theoretical arbitrated figure?

In *Waechter v. Amoco Production Co.*, supra, this court said:

"The sales of gas were not unregulated. Sales of natural gas in interstate commerce became subject to federal regulation by virtue of the [Natural] Gas Act of 1938; however, the FPC did not assume jurisdiction over the pricing of natural gas at the wellhead in the Hugoton field until in 1954 (see *Cities Service Gas Co. v. State Corporation Commission*, 184 Kan. 540, 337 P. 2d 640). Prior to that time there had been a measure of state regulation. Most of the leases contained a clause that both the lessor and lessee contemplated and agreed that the lease in all respects should be subject to valid orders of any duly constituted authority having jurisdiction of the subject matter of the lease. Even without such language in a lease private contracts are subject to the laws of the land (*Home Bldg. & L. Assn. v. Blaisdell*, 290 U. S. 398, 78 L. Ed. 413, 54 S. Ct. 231). . . ." (p. 511.)

Most of the leases in our present case contained similar clauses contemplating future regulation of the production and marketing of gas.

The majority opinion, as well as the opinion of the Chief Justice, makes use of what we perceive to be an erroneous conclusion based upon a reading of *Weymouth v. Colorado Interstate Gas Company*, 367 F. 2d 84 (5th Cir. 1966), and *J. M. Huber Corporation v. Denman*, 367 F. 2d 104 (5th Cir. 1966). The majority opinion states, "*Huber* thus stands for the proposition that a 'market value' lease on its face calls for payment at the theoretical free market value. . . ." The opinion of the Chief Justice also utilizes a theoretical free market value to arrive at its conclusions.

Such statements, if based upon *Huber*, can only relate to unregulated sales of gas for as to regulated sales, the court in *Huber* said:

". . . Ever since the decision in *Rayne Field* [United Gas Improvement Co. v. Continental Oil Co., 381 U. S. 392, 14 L. Ed. 2d 466, 85 S. Ct. 1517] the Supreme Court has made it clear that neither the form of the transaction nor the peculiarities of state law are controlling in determining whether there is a jurisdictional sale of gas under the Act. 'A regulatory statute such as the Natural Gas Act would be hamstrung if it were tied down to technical concepts of local law.' 381 U. S. 392, 400, 85 S. Ct. 1517, 1522, 14 L. Ed. 2d 466, 472. . . ." (p. 114.)

The court in *Huber* refused to decide the question of the effect of FPC regulation upon the royalty owner's fair market value and concluded:

"Thus we end, as we began, a consideration of these factors pro and con demonstrate that there is at least an arguable basis for FPC jurisdiction. Moreover, these factors ought first to be evaluated by the FPC in the resolution of the question of statutory power and, if that is found to exist, the necessary implementation of that in terms of the extent to which the exercise of that power is or will be appropriate. Lest we be misunderstood, we emphasize again that this analysis is merely to indicate why we conclude primary jurisdiction reference should be made, the Court all the while disclaims any purpose by what it has said or left unsaid, by its comments, express or implied, of declaring or intimating what its views are on the questions referred for initial decision by the FPC and the arguments pro and con." (p. 120.)

In the companion case of *Weymouth v. Colorado Interstate Gas Company*, supra, speaking of the "theoretical free market value" concept as applied to a regulated market, the same judge who wrote *Huber* said:

"So this 'free,' 'willing' buyer is not so 'free.' Nor is his counterpart, the seller. Nor is the commodity. Nor is the business. Nor is the sale. The test in capsulated form is then, what would a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, agree to take and pay with a reasonable expectation that the FPC would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience and necessity." (p. 90.)

In our opinion neither *Weymouth* nor *Huber* will support a conclusion that the lessor in a market price lease is entitled to royalty payments based upon a theoretical free market value when in truth and in fact the market is regulated by the FPC. The majority adopt that conclusion erroneously.

The lessee-producer was obligated to pay royalty based on the best price obtainable at the wellhead. The trial court found it acted in good faith and sold the gas for the best price obtainable in the only market available. Under these circumstances the one-eighth royalty payments due under both the "proceeds" and the "market price" leases simply amount to the same in dollars. The entire judgment of the district court should be reversed.

PRAGER and MILLER, JJ., join in the foregoing concurring and dissenting opinion.