**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 6 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED PHOSPHORUS, LTD., a corporation organized under the laws of India; INVENTA CORPORATION, a New Jersey Corporation,

    Plaintiffs-Appellees and Cross-Appellants,

v.

MIDLAND FUMIGANT, INC.; DONALD F. FOX,

    Defendants-Appellants and Cross-Appellees,

PHOS-FUME CHEMICAL CO., formerly a Kansas corporation; KAW VALLEY, INC., a Kansas corporation,

    Defendants-Appellants.

Nos. 98-3222
      98-3233
      98-3279
      99-3099

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No . 91-2133-GTV)**

---

Floyd R. Finch, Jr. (Shelley A. Runion with him on the briefs) of Blackwell Sanders Peper Martin LLP, Kansas City, Missouri, for Plaintiffs-Appellees and Cross-Appellants.

John C. Tillotson (D.A.N. Chase of Chase & Yakimo, Overland Park, Kansas with him on the briefs) of Murray, Tillotson, Nelson & Wiley, Chartered, Leavenworth, Kansas, for Defendants-Appellants and Cross-Appellees.

---

Before **BALDOCK, BRORBY** and **LUCERO**, Circuit Judges.

_____

**BRORBY**, Circuit Judge.

United Phosphorus (United) brought this action against Midland Fumigant (Midland), and its president, Donald Fox, claiming violation of the Lanham Act, fraudulent trademark registration, trademark infringement, unfair competition, violation of the Racketeer Influenced and Corrupt Organization Act (RICO), and common law fraud, all in conjunction with Midland's use of the "Quick-Phos" trademark for the fumigant aluminum phosphide. Following trial, a jury found in favor of United on every claim save the RICO claim and awarded United a total of $2,075,929 in damages. The jury also recommended punitive damages be assessed against Mr. Fox personally for his fraudulent activity. In response to post-judgment motions, the district court refused to award United treble damages or prejudgment interest, reduced the amount of the jury's award, and granted United's request for attorney fees. The parties now cross-appeal various district court rulings. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm in part, reverse in part, and remand to the district court.

BACKGROUND

United, a company based in India, manufactures aluminum phosphide, which is used to fumigate grains, nuts, tobacco, and sealed storage facilities. The fumigant must be registered with and approved by the Environmental Protection Agency in order to be sold in the United States. In addition, the registrant must be a United States-based firm. In order to sell their product in the United States, United entered into an agreement with J.O. Hibbard. Mr. Hibbard's corporation, Phos-Fume Chemical Company (Phos-Fume), agreed to register United's product and act as United's exclusive distributor of its aluminum phosphide in the United States. United had sold its aluminum phosphide under the name "Quick-Phos" throughout the world, and eventually asked Mr. Hibbard to use this name when registering with the Environmental Protection Agency. The Environmental Protection Agency approved Phos-Fume's use of the Quick-Phos name for United's aluminum phosphide products on October 3, 1983. Despite an agreement that United owned the name Quick-Phos, Mr. Hibbard also applied for and received a Kansas trademark registration for Quick-Phos in his company's name.

In late 1987, Mr. Hibbard sold Phos-Fume to Donald Fox's newly-formed corporation, Midland. After a disappointing initial transaction in May 1988,

Midland and United had a disagreement concerning the appropriate price for United's Quick-Phos, and Midland stopped purchasing aluminum phosphide from United. Instead, Midland purchased cheaper aluminum phosphide with a reputation for poor quality. When it had trouble selling the inferior product, Midland printed its own "Quick-Phos" labels, relabeled the product, and sold the inferior product to its customers under the Quick-Phos name.

In July 1988, United's chairman wrote a letter to Mr. Fox and Midland claiming United owned the exclusive rights to use the Quick-Phos name in the United States, and Midland could not use the name on other products. In January 1989, Midland applied for a federal trademark registration for "Quick-Phos" with the Office of the Commissioner of Patents and Trademarks, which was granted in September of the same year.

On April 19, 1991, United filed its complaint, alleging Midland violated the Lanham Act, false or fraudulent registration of a trademark, trademark infringement, and unfair competition. The case was settled in late October 1991. In the settlement agreement, Midland agreed to (1) cancel its trademark registration for Quick-Phos immediately; (2) cancel the name Quick-Phos from its Environmental Protection Agency registration immediately; (3) sell its existing

stocks of aluminum phosphide labeled Quick-Phos within three months; (4) not sell any further product labeled Quick-Phos without United's permission; and (5) not sell any further product labeled Quick-Phos unless the product was manufactured by United. United suspected Midland had breached the settlement agreement in various ways from the beginning, and ultimately United moved to set aside the settlement agreement in March 1994. In fact, Midland did not cancel its Quick-Phos trademark with the United States Patent and Trademark Office until May 1994. A district court found Midland had repudiated the settlement agreement through various misrepresentations and its failure to cancel the trademark, and set aside the settlement agreement in January 1995. In addition to the revived initial suit, United filed a second suit against Mr. Fox for common-law fraud, and various entities, alleging violations of the RICO statute. The cases were consolidated for trial, which took place over two and one-half weeks in October 1997.

The jury determined United owned the Quick-Phos mark and Midland had committed trademark infringement, fraudulently procured a federal trademark registration, and unfairly competed. The jury awarded United $761,866 in damages on these counts. In addition, the jury found Mr. Fox was liable for fraud in the breach of the settlement agreement, awarded United $1,314,063 in damages

on this count, and recommended the district court impose punitive damages against Mr. Fox. Finally, the jury found for the defendants on the RICO claim. In response to various post-judgment motions, the district court denied United treble damages and prejudgment interest, imposed punitive damages against Mr. Fox in the amount of $653,217, reduced the jury's award of fraud damages from $1,314,063 to $67,694.03, and awarded United $313,133.27 of its requested $917,411.01 in attorney fees and costs. Not surprisingly, both sides find fault with the district court's rulings and these cross-appeals followed.

## DISCUSSION

### I. Improper Jury Instructions

Midland's first assigned error is somewhat confused. In its initial brief, Midland states "Jury Instruction No. 17 regarding trademark ownership was given in error as it misstated the law and misguided the jury." Unfortunately for Midland, it drafted and requested this instruction. We normally will not review an instruction when the party objecting to the instruction on appeal is the party who championed the instruction at trial. *See Aves v. Shah*, 997 F.2d 762, 766 (10th Cir. 1993). However, after a careful review of Midland's argument, it becomes clear Midland's real objection goes not to the submission of Instruction No. 17, but to the trial court's refusal to submit five other instructions Midland

had offered to the court. As such, the issue on appeal is whether the trial court erred by not submitting Midland's proposed instructions numbered 7-11 to the jury, thus providing the jury with an incomplete picture of applicable law.[1]

> We review the district court's decision to give a particular instruction for abuse of discretion. To determine whether the jury was adequately instructed on the applicable law, we review the instructions in their entirety de novo to determine whether the jury was misled in any way. The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.

*Medlock v. Ortho Biotech, Inc*., 164 F.3d 545, 552 (10th Cir.) (citations omitted), *cert. denied*, 120 S. Ct. 48 (1999).

Rather than reproduce the relevant instructions in their entirety here, we will narrow our discussion a great deal. Midland's proposed instructions numbered 7, 10, and 11 dealt with who may own a trademark. The district court adequately covered this topic in its Instruction No. 16 by pointing out either a merchant or a manufacturer may develop goodwill in a product and come to own a trademark through the use of the mark. Instruction No. 16 also makes clear the

---

[1] United argues Midland did not properly preserve this issue for appeal. We disagree. The record clearly shows Midland's objection and the district court's response.

first party to use the mark establishes ownership, thus taking care of the main thrust of Midland's Proposed Instruction No. 8. What the district court failed to provide the jury, then, is the portion of Proposed Instruction No. 8 which deals with "lawful use," and the related language in Proposed Instruction No. 9. Proposed Instruction No. 9 states: "To have lawful use of a trademark in the United States for aluminum phosphide requires an EPA approved label. A sale in interstate commerce in contravention of EPA regulations is not a lawful use." This language misstates the law, and is inconsistent with the evidence presented at trial.

Midland correctly states that in order to obtain rights in the Quick-Phos trademark, United needed to show the name was lawfully used in commerce. *See* 15 U.S.C. § 1127; *Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522, 526 (Fed. Cir. 1987); *The Clorox Co. v. Armour-Dial, Inc.*, 214 U.S.P.Q. 850, 851 (TTAB 1982) ("'use in commerce' means a 'lawful use in commerce'"). Midland then makes the utterly unsupportable claim that because United did not own the Quick-Phos registration with the Environmental Protection Agency, and thus could not sell Quick-Phos in the United States without a domestic registrant, United could not show prior lawful use in commerce. Midland cites no authority for this theory. The Trademark Trial and Appeal Board cases Midland does cite stand for the

well-reasoned proposition that shipping goods in violation of federal law cannot qualify as the "use in commerce" necessary to establish trademark rights. *See Medtronic, Inc. v. Pacesetter Sys., Inc.*, 222 U.S.P.Q. 80, 82 (TTAB 1984); *Clorox*, 214 U.S.P.Q. at 851. However, Midland failed to present one piece of evidence at trial tending to show United's product was sold or distributed illegally. Had United sold Quick-Phos without registering with the Environmental Protection Agency, Midland would have a strong case that United did not have a right in the trademark, and Midland may have been entitled to its requested instructions. However, without the offer of any evidence to support the theory underlying the proposed instructions, the district court did not abuse its discretion by refusing to submit the instructions to the jury. *See Higgins v. Martin Marietta Corp.*, 752 F.2d 492, 496 (10th Cir. 1985). The instructions, taken as a whole, gave the jury an adequate explanation of trademark law, the jury was not misled, and we find no error.

II. Fraudulent Registration

Midland next argues the evidence was insufficient to support the jury's verdict that Midland fraudulently procured the Quick-Phos trademark registration, therefore the district court erred by denying Midland's motion for judgment as a matter of law.

We review de novo the district court's denial of a litigant's motion for judgment as a matter of law filed pursuant to Fed. R. Civ. P. 50(b). We will reverse such a ruling only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion. In our review, we may not weigh the evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. Further, we must construe all evidence and the inferences therefrom in the light most favorable to the non-moving party.

*Kinser v. Gehl Co.*, 184 F.3d 1259, 1267 (10th Cir. 1999) (quotation marks and citations omitted), *cert. denied*, 120 S. Ct. 985 (2000). When we review a sufficiency of the evidence claim, "our review is limited to determining whether the record – viewed in the light most favorable to the prevailing party – contains substantial evidence to support the jury's decision." *Comcoa, Inc. v. NEC Tel., Inc.*, 931 F.2d 655, 663 (10th Cir. 1991). "The jury, moreover, has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *Kitchens v. Bryan County Nat'l Bank*, 825 F.2d 248, 251 (10th Cir. 1987).

Section 38 of the Lanham Act creates civil liability for those who fraudulently procure a trademark registration:

Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages

sustained in consequence thereof.

15 U.S.C. § 1120. In order to prove fraudulent procurement, United was required

to show:

> (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance.

*San Juan Prods., Inc. v. San Juan Pools of Kansas, Inc.*, 849 F.2d 468, 473 (10th

Cir. 1988). Midland concedes we are concerned solely with the second element

for the purposes of this appeal.


As part of the trademark registration application, Midland's president,

Robert Shockey, signed an affidavit attesting that to the best of his belief and

knowledge, "no other person, firm, or corporation ha[d] the right to use said mark

in commerce, either in the identical form or in such near resemblance hereto as

may be likely when applied to the goods of such other person to cause confusion

or to cause mistake or to deceive." *See* 15 U.S.C. § 1051. In determining

whether this statement was fraudulent, we focus on the "declarant's subjective,

'honestly held, good faith' belief." *San Juan Prods.*, 849 F.2d at 472 (citation

omitted). Therefore, United had the burden of proving, by clear and convincing

evidence, Robert Shockey signed the oath on Midland's behalf knowing United

-11-

had the right to use the Quick-Phos mark in commerce. *See Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 874 (10th Cir.), *cert. denied*, 516 U.S. 920 (1995); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 942 (10th Cir. 1983) (burden of proof is clear and convincing). Mindful of our characterization of this burden as a heavy one, on this record we hold the evidence can support the jury's finding of fraud.

When Midland applied for the trademark registration, company representatives knew United had been selling Quick-Phos in the United States for several years. Midland itself had purchased Quick-Phos from United and resold the product in the United States. United had notified Midland that United owned the Quick-Phos name, that Mr. Hibbard had been permitted to use the name by specific agreement, and that Midland should not attach the mark to non-United products. Finally, Midland had already relabeled inferior product under the Quick-Phos mark after initially trying to sell the product under another name, because it became clear the marketplace recognized the superior quality of United's Quick-Phos product. Given these facts, the jury was free to find Midland's representatives knew United owned the Quick-Phos mark and had the

right to use the mark in interstate commerce.[2] Midland seems to argue Mr. Fox's and Mr. Shockley's self-serving testimony that they believed Midland owned the mark is dispositive. We disagree and join the district court in pointing out the jury was free to make its own credibility determination and in so doing find these witnesses had none. United was not required to pry an admission out of Midland's representatives on the stand in order to meet its burden of proof. *See Global Maschinen GmbH v. Global Banking Sys., Inc.*, 227 U.S.P.Q. 862, 867 (TTAB 1985) ("That the record contains no direct evidence of respondent's intent does not mitigate the fraud nor preclude us from holding that respondent's conduct was fraudulent."); *Hank Thorp, Inc. v. Minilite, Inc.*, 474 F. Supp. 228, 238 (D. Del. 1979). Mr. Shockley's subjective belief United did not have a right to use the mark must be an "'honestly held, good faith' belief." *See San Juan Prods.*, 849 F.2d at 472 (citation omitted); *Stanfield*, 52 F.3d at 874 (defendant could have reasonably believed plaintiff waived rights to trademark). The jury didn't buy Mr. Shockley's and Mr. Fox's protestations, and we will not disturb the jury's verdict given the facts on the record.

---

[2] Midland points to the Kansas registration of the Quick-Phos mark in Phos-Fume's name as evidence of its good faith. However, knowing an acquired subsidiary registered a mark in a state is an entirely different issue than whether Midland knew United had a right to use the mark in interstate commerce. *See Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 672 n.6 (7th Cir. 1982).

III. Double Recovery

Midland next argues the district court erred by denying its motion for judgment as a matter of law and letting stand the jury's award of $761,866 in damages to United on the trademark infringement, fraudulent registration, and unfair competition claims. Specifically, Midland claims the jury's award constituted a double recovery of both United's lost profits and Midland's profits, the result of which is United's overcompensation. We disagree.

> The Lanham Act's general damages provision provides in pertinent part:
>
> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction.

15 U.S.C. § 1117. While the damages allowed under the statute are joined with the conjunction "and," the district court correctly pointed out a plaintiff in a trademark infringement case generally cannot recover its lost profits in addition to the defendant's profits. However, Midland and the district court seem to expand this general result in infringement cases to a general rule that recovery of both types of damages is forbidden. We question this interpretation of the case law,

but because we refuse to speculate on how the jury arrived at the specific amount of damages awarded in this case, we do not address the issue.

United presented various documentary and testimonial evidence at trial that placed its claimed damages on the trademark infringement, fraudulent registration and unfair competition claims at well over $4 million. As part of those claimed damages, United's expert witness calculated Midland's profits on its sale of mislabeled Quick-Phos from 1990 to 1992 as $385,520, and United's lost profits from 1989 to 1992 as $376,346. The sum of these two figures is $761,866, the exact amount the jury awarded as damages. Therefore, Midland argues, the jury award must be an improper double recovery of United's lost profits and Midland's profits. We agree with the district court that this conclusion requires us to speculate as to the jury's deliberations and calculations. While Midland's explanation for the result of the verdict is persuasive, it is not the only explanation. However slight the chance, the jury could have arrived at the figure coincidentally, or more likely, picked the number from plaintiff's exhibits "because it was within the range of the evidence and the jury was somehow attracted to it regardless of the [type of damages] to which it was associated on the exhibits." *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 501 (10th Cir. 1983). *See also Jackson v. Pool Mortgage Co.,* 868 F.2d 1178, 1180

(10th Cir. 1989); *Estes v. Southern Pac. Transp. Co.*, 598 F.2d 1195, 1199-1200 (10th Cir. 1979). We would have a much different case if the only evidence of damages presented at trial was evidence of Midland's profits and United's lost profits. However, given the evidence presented of damages exceeding $4 million, the jury's award was well within the range of proof, and we refuse to characterize the jury's verdict as an impermissible double recovery. United was not overcompensated by the jury's verdict and we affirm the district court's denial of Midland's motion for judgment as a matter of law.[3]

## IV. Constitutionality of Punitive Damages

The jury determined the imposition of punitive damages against Mr. Fox was warranted by finding he acted in a "willful, wanton, or malicious" manner. Meticulously applying Kansas law, the district court awarded United the statutory maximum of $653,217 in punitive damages for Mr. Fox's fraudulent conduct.[4]

---

[3] In the alternative, Midland argues the verdict form was ambiguous on its face and requests a new trial. The cases Midland cites are inapposite here, but we refuse to address the issue because it is raised for the first time on appeal. *Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992).

[4] Kansas law, through Kan. Stat. Ann. § 60-3722, requires the trier of fact to determine whether punitive damages should be allowed. The statute then goes on to cap most awards at the defendant's highest gross annual income earned in the last five years. The district court determined Mr. Fox earned $653,217 in gross income in 1993 and, given the relevant factors, the maximum award was appropriate in this case. The relevant portions of Kan. Stat. Ann. § 60-3072 are:

(a) In any civil action in which exemplary or punitive damages are recoverable, the trier of fact shall determine, concurrent with all other issues presented, whether such damages shall be allowed....

(b) At a proceeding to determine the amount of exemplary or punitive damages to be awarded under this section, the court may consider:
(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;
(2) the degree of the defendant's awareness of that likelihood;
(3) the profitability of the defendant's misconduct;
(4) the duration of the misconduct and any intentional concealment of it;
(5) the attitude and conduct of the defendant upon discovery of the misconduct;
(6) the financial condition of the defendant; and
(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected.

...

(e) Except as provided by subsection (f), no award of exemplary or punitive damages pursuant to this section shall exceed the lesser of:
(1) The annual gross income earned by the defendant, as determined by the court based upon the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded, unless the court determines such amount is clearly inadequate to penalize the defendant, then the court may award up to 50% of the net worth of the defendant, as determined by the court; or

This award amounts to a 9.65:1 punitive to compensatory damages ratio when compared to the $67,694.03 judgment entered against Mr. Fox on the fraud claim.[5]  Midland appeals the award as unconstitutionally excessive.  We review the constitutionality of a punitive damage award de novo.  *FDIC v. Hamilton*, 122 F.3d 854, 857 (10th Cir. 1997).

When reviewing the constitutionality of a punitive damage award, we are guided by the United States Supreme Court decision in *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996), and our subsequent interpretation of that decision in *Continental Trend Resources, Inc. v. OXY USA, Inc.*, 101 F.3d 634 (10th Cir. 1996), *cert. denied*, 520 U.S. 1241 (1997).  Midland argues the current award must be reduced because it violates the requirement that a "defendant must receive 'fair notice ... of the severity of the penalty that a State may impose.'" *OXY*, 101 F.3d at 638 (quoting *BMW*, 517 U.S. at 574).

> It is with respect to this requirement that the Supreme Court set forth its three 'guideposts:'  (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of the punitive award to the actual harm inflicted on the plaintiff, and (3) the comparison between the

---

(2) $5 million.

[5]  The jury originally awarded $1.3 million in damages on the fraud count, which the district court reduced to $67,694.03.  We discuss the reduction in detail in section VI.

punitive award and the civil or criminal penalties that could be imposed for comparable misconduct.

*Id*.

A. Reprehensibility of Mr. Fox's Conduct

Reprehensibility is the most important guidepost for determining the reasonableness of a punitive damage award. *See BMW*, 517 U.S. at 575. "[I]n assessing the reprehensibility of a defendant's conduct, we ask whether the conduct: 'causes economic harm rather than physical harm; would be considered unlawful in all states; involves repeated acts rather than a single one; is intentional; involves deliberate false statements rather than omissions; and is aimed at a vulnerable target.'" *Hamilton*, 122 F.3d at 861 (quoting *OXY*, 101 F.3d at 638).

While Mr. Fox's conduct caused economic harm and was not directed at a particularly vulnerable target in United, the other factors tend to support the imposition of a large award. The jury found Mr. Fox committed fraud, an activity surely considered unlawful in every state. In addition, the evidence presented at trial conclusively showed Mr. Fox repeatedly made deliberate false statements to United, as well as the district court. After settling United's trademark infringement suit in 1991, Mr. Fox instructed his attorney to write a letter to

United claiming all the Quick-Phos product had either been disposed of or relabeled with an appropriate mark, when in fact he had a significant inventory of product improperly labeled with the Quick-Phos mark. Despite evidence to the contrary, Mr. Fox maintained in a letter to United's attorney that Midland did not possess a single invoice showing the name "Quick-Phos" after January 25, 1992. In order to further conceal his fraudulent statements, Mr. Fox instructed a Midland employee to state the same information in an affidavit accompanying Midland's response to United's motion to set aside the 1991 settlement; Mr. Fox submitted falsified invoices to the court suggesting Midland had not sold mislabeled Quick-Phos product after May 22, 1992. All this in addition to his fraudulent activity in procuring the trademark registration and years of deliberately selling inferior aluminum phosphide under the Quick-Phos mark. We have no reservations about characterizing Mr. Fox's conduct as particularly reprehensible.

B.  Punitive to Compensatory Damage Ratio

In *OXY*, we "surmise[d] that in economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ratio." *OXY*, 101 F.3d at 639. Midland points to the 9.65:1 ratio in this case and argues its conduct was not reprehensible

enough to warrant a punitive award approaching the *OXY* "limit." We disagree for several reasons. First, we have already rejected Midland's characterization of the reprehensibility of its conduct as relatively minor. Second, the 10:1 ratio is not a sacred line in the sand, across which no punitive award may venture without feeling the wrath of an appellate court's constitutional sword. The Supreme Court was very careful to reject such a categorical approach in *BMW*. *See BMW*, 517 U.S. at 582-83. We see nothing in the ratio itself that requires us to hold the award at issue here is unconstitutionally excessive. Nor are we persuaded by Midland's more detailed arguments that a reduction of this award is constitutionally compelled.

Midland argues a modest award is appropriate here because the economic injury arises out of a contractual relationship, and the parties should have protected themselves through explicit remedies for breach in the settlement agreement. *See Hamilton*, 122 F.3d at 862. We might agree with Midland had a district court not determined Midland's conduct was so objectionable as to justify the rare remedy of completely setting aside the 1991 settlement agreement. Any explicit remedies for a breach contained in the settlement agreement conceivably would have been set aside along with the agreement itself.

In addition, Midland's objection to the ratio is based on a comparison of the $67,694.03 in compensatory damages with the $653,217 in punitive damages. However, when determining the ratio of punitive damages to the harm caused, both actual and potential damages may be used to determine the harm. *OXY*, 101 F.3d at 639-40; *see generally BMW*, 517 U.S. at 581-82. The district court awarded the $67,694.03 in damages to compensate United for the costs of bringing its motion to set aside the 1991 settlement agreement.[6] The district court ruled further damages caused by Fox's fraud – such as lost income to United and damage to United's name and reputation in the marketplace – were subsumed in the damages awarded on the trademark infringement, unfair competition, and fraudulent registration claims. Reducing a damage award to avoid a double recovery is entirely different than reducing an award due to a lack of evidence supporting the level of damages. A fundamental truth lies at the core of this

---

[6] As discussed in section VI, the district court reduced the original jury award of over $1.3 million on the fraud count to $67,694.03. Midland argues the punitive damage award was determined in relation to the original jury award, and the subsequent reduction of the compensatory damages require a similar reduction in the punitive award. This argument has no merit. The district court did not base its punitive damage award on the compensatory damage amount, but instead employed Kansas law, and the factors listed therein, to award the highest punitive damage award allowed. The district court explicitly decided not to adjust the punitive damage award after reducing the compensatory damages. Regardless, this calculation is entirely separate and distinct from our determination of the constitutionality of an award.

once-settled case: Had Mr. Fox succeeded in masking Midland's activity through his fraudulent conduct, none of the damages awarded in this case would have been discovered or ultimately recovered. And, arguably, the damages suffered after the settlement in 1991 could have been prevented entirely but for Mr. Fox's fraud. Clearly the actual and potential damages caused by Mr. Fox's fraud substantially exceeded the $67,694.03 awarded. That those damages were subsumed in the jury's $761,866 award on the other counts does not prevent us from recognizing that fact. United's damages expert testified Mr. Fox's scheme cost United $74,215 in lost profits in 1992 alone. Adding this one small measure of the additional damages caused by Mr. Fox's fraud to our original calculation brings the punitive to harm ratio down to less than 6:1.

### C. Civil and Criminal Penalties

The final guideline – whether comparable civil or criminal penalties alert a defendant to the possibility of substantial punitive damages in the wake of his illegal conduct – does lean in Midland's favor. A finding of common law fraud does not lend itself to comparison with statutory penalties. *See OXY*, 101 F.3d at 641 (violation of common-law tort duties). In addition, United fails to specifically cite one statute or case that can be read to put Midland on notice its conduct could result in a large punitive award of over half a million dollars.

While large punitive awards are not unusual in trademark infringement cases, *cf. Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1376 (10th Cir. 1977) ($4 million award, 6:1 ratio), *cert. dism'd*, 434 U.S. 1052 (1978), we did not find any comparable Kansas cases. Therefore, this guidepost lends credence to a smaller punitive award.

Weighing all the factors relevant to our determination, we hold the punitive damage award in this case is not unconstitutionally excessive. Even assuming the total amount of actual and potential harm in this case is $67,649.03, as Midland suggests, the punitive to actual damage ratio is less than 10:1. We held the maximum constitutionally permissible ratio in *Hamilton* and *OXY* was 6:1. Midland's activity is much more reprehensible than was the defendant's in *Hamilton*, where the court determined the fraudulent conduct did not involve repeated acts. In addition, the fraud here involved documents submitted to the courts, and it entailed a complete refusal to make a good-faith effort to comply with a settlement agreement. Surely the State of Kansas has a strong interest in deterring this type of conduct, and Fox's continued efforts to disguise his abhorrent behavior with further lies warrants a stiff punitive award. Finally, we note this award was not the product of an emotionally-driven jury run amok, but a district court thoughtfully applying a strict state statute regulating the process to

be followed and amounts allowed for punitive damages.  Given the specific facts of this case, we hold the punitive award is constitutional.

V.  Attorney Fees

Finally, Midland argues the district court erred by awarding attorney fees under the Lanham Act, or in the alternative, the court should have reduced the fees by more than it did.  On cross-appeal, United argues the court erred by substantially reducing the requested fees.

The Lanham Act gives the trial court discretion to award reasonable attorney fees to the prevailing party in "exceptional" cases.  *See* 15 U.S.C. § 1117(a).  We review the decision to award attorney fees, and the amount awarded, for abuse of discretion.  *See Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249 (10th Cir. 1998)*; Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1224 (10th Cir. 1998).  "Underlying factual findings will only be upset when clearly erroneous.  However, a district court's statutory interpretation or legal analysis which provides the basis for the fee award is reviewable de novo."  *Bishop*, 154 F.3d at 1224 (quotation marks and citations omitted).

The Lanham Act does not define what is an "exceptional" case, but we have

determined it occurs when a trademark infringement is malicious, fraudulent, deliberate, or willful. *See id.* (citing *VIP Foods, Inc. v. Vulcan Pet, Inc.*, 675 F.2d 1106, 1107 (10th Cir. 1982) (quoting S. Rep. No. 93-1400 (1974), *reprinted in* 1974 U.S.C.C.A.N 7132, 7133)). The district court found more than enough evidence to characterize Midland's trademark infringement as malicious, fraudulent, deliberate, and willful. The court based its decision on Midland's deliberate relabeling of inferior product under the Quick-Phos mark, even after repeated warnings to stop doing so. This conduct not only took unfair advantage of United's trademark, but it deceived Midland's customers. Remarkably, Midland continued to infringe on United's trademark even after agreeing to stop doing so in the settlement agreement. The court also stressed Midland's explanations for this egregious conduct lacked credibility. Based on the record before us, we are unwilling to say the district court abused its discretion in awarding attorney fees to United.

Midland complains the district court improperly based its award of attorney fees on Midland's violation of 15 U.S.C. § 1120. While the district court did mention, in near exasperation, Mr. Fox's fraudulent filing of the trademark registration, and it is true § 1120 does not allow for the award of attorney fees, the remark came at the end of a long list of inappropriate activity that supports

the "exceptional" case label. In addition, the district court specifically stated later in its Order that attorney fees are not recoverable under § 1120. We are not convinced the district court incorrectly considered the facts of this case when making its determination that attorney fees were warranted.

Having determined the district court acted within its discretion in awarding United its attorney fees, we now turn to the amount awarded. United sought a total of $912,976.01 for attorney fees and expenses. United's attorney submitted an affidavit in support of the motion for attorney fees stating the hourly rates charged by his firm ranged from $160 to $200 per hour for partners, $105 to $135 for associates, $65 to $80 for paralegals, and $25 for document clerks. In addition, United submitted one affidavit from another attorney in Kansas City who reviewed the rates, stating the rates were within the range of what attorneys with comparable skill and experience practicing trademark infringement law in the Kansas City area would charge. After considering United's evidence of prevailing market rates, the district court awarded the following rates based instead on its "own familiarity with the relevant rates in this community:" $150 per hour for lead counsel, $125 per hour for all other attorneys (unless United requested a lower figure in its motion), $50 per hour for paralegals and staff, and $25 per hour for document clerks. The district court found United's time records

cumbersome, and stated it was difficult to determine how much time was spent on successful versus unsuccessful claims. The court further found United over-staffed the suit, and the attorneys and staff who did do significant work on the case billed for an excessive number of hours. After reducing unreasonable billings, the court determined a total allowable fee, which was then reduced a further twenty percent to account for time spent on claims which were either not filed under the Lanham Act, or which did not allow recovery of attorney fees. The end result was an award of attorney fees and costs to United in the amount of $313,133.27.

We first dispose of Midland's argument that the twenty percent general reduction for time spent on non-Lanham Act claims was insufficient. Midland argues the non-compensable aspects of the lawsuit represented a higher percentage of the total time and energy expended by United than the twenty percent reduction shows. This is a complex determination, going beyond the mere number of claims involved, but examining the time reasonably spent on each claim and the overlap between compensable and non-compensable claims. The trial court is in a much better position to make this determination than we are, and we find nothing on this record to convince us the district court abused its discretion here. In *The Post Office v. Portec, Inc.*, 913 F.2d 802, 813 (10th Cir.

1990), *vacated on other grounds*, 499 U.S. 915 (1991), we approved a reduction of an actual award of fees by twenty percent to account for the existence of non-Lanham Act claims in the suit. The district court cited *Portec* when it stated the fairest way to avoid overcompensation was to reduce this award by twenty percent after eliminating all unreasonable billings. Midland argues the court misread *Portec* and automatically reduced the award by twenty percent, instead of reducing the award by an appropriate percentage as applicable in this case. We find no support for this argument in the record. First, the court imposed the reduction after eliminating all "unreasonable" billings, so the reduction was applied only to fees reasonably earned in the pursuit of successful claims. The court also explicitly stated no attorney fees were awarded for work on the fraud claim because the sole damages under that claim already included the attorney fees incurred in setting aside the settlement agreement. Finally, the court noted the attorney fees awarded would compensate United only for work done on the trademark infringement claim, with the addition of the small amount of time spent on United's unfair competition claim which cross-pollinated the trademark infringement case. The resulting twenty percent reduction is not on its face inadequate given the importance of the infringement case as opposed to United's other claims. The district court carefully examined all elements of this case, the pleadings, the time spent at trial, and the jury instructions to arrive at the

appropriate reduction in this case. We will not find error solely because the resulting reduction happened to be the same amount as affirmed in a different case.

We now turn to the district court's specific reductions of hours and fees. Having thoroughly explored the proper process to be used by a trial court in awarding attorney fees recently in *Case*, we will keep our discussion here brief. When determining what is a reasonable award of attorney fees, the district court must calculate the "lodestar," which is the reasonable number of hours spent on the litigation multiplied by a reasonable hourly rate. *See Case*, 157 F.3d at 1249. The party requesting attorney fees bears the burden of proving the amount of hours spent on the case and the appropriate hourly rates. *Id*. In order to prove the number of hours reasonably spent on the litigation, the party must submit "meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks." *Id*. at 1250. The district court can reduce the number of hours when the time records provided to the court are inadequate. *Id*. Finally, the district court must reduce the actual number of hours expended to a reasonable number to ensure services an attorney would not properly bill to his or her client are not billed to the adverse party. *Id*.

When determining the appropriate rate to apply to the reasonable hours, "the district court should base its hourly rate award on what the evidence shows the market commands for ... analogous litigation." *Id*. at 1255. The party requesting the fees bears "the burden of showing that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Ellis v. University of Kan. Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998) (quotation marks and citation omitted). The focus must be on the "prevailing market rate in the relevant community." *See id.* (quotation marks and citation omitted). "[A] district court abuses its discretion when it ignores the parties' market evidence and sets an attorney's hourly rate using the rates it consistently grant[s]." *Case*, 157 F.3d at 1255 (quotation marks and citation omitted). The court may not use its own knowledge to establish the appropriate rate unless the evidence of prevailing market rates before the court is inadequate. *Id*. at 1257; *see Lucero v. City of Trinidad*, 815 F.2d 1384, 1385 (10th Cir. 1987). Applying these general principles to the case before us, we determine the district court did not abuse its discretion in reducing the number of United's requested hours, but improperly substituted its own knowledge for the evidence presented on prevailing market rates.

The district court reduced the lodestar hours for several reasons:  the court was convinced United had not adequately reduced its claimed hours for work performed on its unsuccessful RICO claim, which was a significant portion of United's case; United failed to provide sufficiently specific billing records to allow the court to delineate hours spent on successful and unsuccessful claims; work on this case by seven partners, thirty-two associates, one summer clerk, ten paralegals, and one document clerk showed United's counsel over-staffed the case.  As a result, the court eliminated from the billing request everyone who spent "minimal" time on the case, defined by the court as less than forty hours.  In addition, the district court eliminated hours spent on background research designed to familiarize attorneys with trademark law, and hours spent traveling when no work was done on the case.  The court found most of the billing records too vague to aid in determining the reasonableness of the time spent, and noted the attorneys in the case billed for activities properly performed by support staff.  Finally, the court determined United's attorneys requested a significant number of hours for activities unrelated to the case, such as research on venue transfer issues and the decisional histories of judges in the district of Kansas.  Ultimately, after eliminating the billings of less than forty hours, the district court reduced the requested hours by thirty-five percent prior to calculating the lodestar.  Given the inadequacy of the billing records, and the district court's detailed explanation of

its reasons for reducing the hours, we are unwilling to say the court abused its discretion.

Unfortunately, such detail is lacking in the district court's determination of the reasonable hourly rate. The district court's decision makes no reference to the evidence presented by either party on prevailing market rate. While the district court decided this issue without the benefit of our guidance in *Case*, the court's sole articulated basis for awarding the hourly rates applied in this case was its "own familiarity with the relevant rates in this community." This is an abuse of discretion. "[I]n order to comply with precedent, the district court must award rates compatible with competent, trustworthy evidence of the market." *Case*, 157 F.3d at 1256. Without some reference to the evidence presented by the parties as justification for setting the hourly fee, we must reverse the district court's decision and remand for redetermination of a reasonable hourly fee consistent with the guidelines we articulated in *Case*.

VI. Damages

In its cross-appeal, United assigns error to the district court's reduction of the jury's award of damages for the fraud claim from $1.3 million to $67,694.03, the trial court's denial of treble damages on the trademark infringement claim,

and the court's denial of prejudgment interest.

Ruling on Midland's motion for judgment as a matter of law, the district court determined the maximum allowable damage award on United's fraud claim was $67,694.03. The court based its decision on several related factors: (1) the final pretrial order limited United's request for damages to this amount; (2) no evidence was presented at trial as to damages beyond the legal fees incurred in setting aside the 1991 settlement; and (3) awarding damages beyond the legal fees would amount to a double recovery. As stated earlier, we review the grant of a motion for judgment as a matter of law de novo. *See Kinser*, 184 F.3d at 1267.

"A pretrial order controls the subsequent course of the suit unless the trial court modifies it to prevent manifest injustice." *Rock Island Improvement Co. v. Helmerich & Payne, Inc.*, 698 F.2d 1075, 1081 (10th Cir.), *cert. denied*, 461 U.S. 944 (1983). In the pretrial order, United stated the "[d]amages caused to plaintiffs by this fraud are the delays incurred by plaintiffs in uncovering defendants' wrongdoing and would be subsumed within the actual damages and prejudgment interest sought by plaintiffs on the other counts of the complaint." Final Pretrial Order. Later, United claimed as relief for this count "[d]amages in the amount of $67,694.03 representing the legal fees incurred in

setting aside the settlement." *Id*. at 14. The district court correctly pointed out a jury award exceeding the requested relief does not invalidate the award. *See Menne v. Celotex Corp.*, 861 F.2d 1453, 1474 (10th Cir. 1988) (citing Fed. R. Civ. P. 54(c)). However, the information in the pretrial order does support the district court's ruling that a remittitur was necessary to avoid a double recovery.

"Where a jury award duplicates damages, the court, either *sua sponte* or on motion of a party, should reduce the judgment by the amount of the duplication." *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997) (citation omitted). Whether damage awards are duplicative is a question of fact, which we review for clear error. *Id*. The district court found the evidence presented at trial of Mr. Fox's fraudulent behavior "abundant," but also stated none of that evidence tended to show damages separate and distinct from those sought under United's other claims. United fails to direct us to one place in the trial transcript that refutes the court's finding. In fact, the pretrial order language seems to us a tacit admission by United that any recovery on the fraud claim above and beyond $67,694.03 would constitute a double recovery. We also note United does not advance a single argument on appeal, other than pure speculation on how the jury reached its various verdicts, directly attacking the double recovery aspect of the district court's ruling. United's argument seems to rely on

the following logic: (1) the evidence at trial was sufficient to prove Mr. Fox's fraud; (2) United presented sufficient evidence to prove over $4 million in damages; (3) the jury's total award on all claims was less than $4 million; therefore, we offered evidence at trial to support an award on the fraud claim above $67,694.03. Unfortunately for United, this argument ignores the issue before us, namely whether there was any evidence presented showing fraud damages separate and distinct from the trademark infringement, unfair competition, and fraudulent registration damages. The silence from United on this point is deafening. Finally, United is reduced to arguing over the definition of "subsumed" in the pretrial order, claiming the word means "intertwined," and not "indivisible." We find such hair-splitting unnecessary here. The only evidence presented at trial on the issue of damages for the fraud count, separate and distinct from the other claims, was the evidence of the legal fees incurred in setting aside the settlement agreement. The district court's finding that any award above that amount constituted a double recovery was not clearly erroneous.

In the alternative, United claims the district court abused its discretion in denying United's motion to amend the pretrial order to conform with the evidence presented at trial. We review a denial of a motion to amend the pretrial order for abuse of discretion. *See R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.,*

835 F.2d 1306, 1308 (10th Cir. 1987). The pretrial order may be amended to prevent manifest injustice. *Id.* (citing Fed. R. Civ. P. 16(e)). In addition, the pretrial order is considered amended when an issue is tried with the consent of the parties. *Id.* Our analysis of the district court's reduction of damages exposes the futility of this argument. First, there was no evidence presented at trial justifying an amendment; the evidence presented pertaining to damages was necessary for the non-fraud counts. Second, the district court made clear it did not reduce the award solely because the pretrial order seemed to limit damages, but instead reduced the award to avoid a double recovery. Amending the pretrial order would have no impact on the double recovery analysis. We see no manifest injustice in this case requiring an amendment of the pretrial order.

United next claims the district court erred by not awarding treble damages. The Lanham Act gives a district court discretion to award treble damages: "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). The statute specifically states a court "may" award treble damages, therefore our review of the district court's decision not to award treble damages is for an abuse of discretion. *See Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170

F.3d 985, 996 (10th Cir. 1999). After careful consideration, the district court determined United's request for treble damages was not warranted in this case because the jury award adequately compensated United. We see nothing in the record to convince us the court abused its discretion by denying United's request.

United also appeals the district court's denial of prejudgment interest. We review a decision to grant or deny prejudgment interest for an abuse of discretion. *See Kleier Adver., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1040 (10th Cir. 1990). We look to federal law to determine the propriety of prejudgment interest on the federal claims and to Kansas law for the pendent state claim. *See U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1254-55 (10th Cir. 1988), *implied overruling on other grounds recognized by Anixiter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996). In its denial of United's motion during trial, the district court based its decision on the somewhat speculative nature of the damages calculations and the fact the damages could not "even approach[] being a liquidated amount." Based on the limited record we have before us, we are concerned the trial court incorrectly applied the governing standards of prejudgment interest.

While the general rule in Kansas is that prejudgment interest is awarded

only for liquidated claims, there are exceptions which may or may not apply in this case. *See Lightcap v. Mobil Oil Corp.*, 562 P.2d 1, 15-16 (Kan.) *cert. denied*, 434 U.S. 876 (1977). Regardless, in the federal context, this Court has adopted a preference, if not a presumption, for prejudgment interest. *See FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1388 (10th Cir.) ("prejudgment interest should normally be awarded on successful federal claims"), *cert. denied*, 119 S. Cg. 404 (1998); *Kleier Adver.*, 921 F.2d at 1041-42; *Touche Ross*, 854 F.2d at 1256 ("under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it"). In addition, "[w]hether or not the damages were liquidated is not dispositive under federal law." *Overbrook Farmers Union Coop. Ass'n v. Missouri Pac. R.R. Co.*, 21 F.3d 360, 366 (10th Cir. 1994). We must reverse the district court's denial of prejudgment interest because the court employed the wrong federal standard, and may have needlessly limited his decision on the state law claims. On remand, the district court should more fully develop its analysis as to the state law claims, and for federal purposes focus on a two-step analysis: (1) whether an award of prejudgment interest would serve to compensate United; and (2) if so, whether equity precludes an award. *Kleier Adver.*, 921 F.2d at 1042 n.4.

Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for

redetermination of attorney fees and a re-examination of whether prejudgment interest is appropriate.